In the Matter of the Complaint of ARMATUR, S.A., and Tourship Co., S.A., as owners and operators of the M/V "A. Regina" for Limitation of Liability, Petitioners.

Civ. Nos. 85–1674, 85–1200—85–1202, 85–1250, 85–1933, 85–1942.

United States District Court, D. Puerto Rico.

Sept. 15, 1988.

Herbert W. Brown, III, Calvesbert & Brown, San Juan, P.R., for petitioners.

Fernando Iglesias, Miguel Gimenez Muñoz, Río Piedras, P.R., for Julio Norka & Esther Obregón.

Philip E. Roberts, Rebecca Santiago Méndez, San Juan, P.R., for claimant Santos Correa.

Rosalinda Pesquera Dávila, Elías Dávila Berríos, Hato Rey, P.R., for claimants Manuel Concepción, Ineabelle Torres, Altagracia Cruz, and Carlos Zorilla.

## OPINION AND ORDER

LAFFITTE, District Judge.

As February 14, 1985 passed unobtrusively into the 15th the officer on watch on the bridge of the M/V "A. Regina" was yet unaware that a massive, unforgiving obstruction lay in the ship's path dead ahead. Some twenty minutes later the "A. Regina" was foundering helplessly, wedged inextricably on the reef fringing the southeastern edge of Mona Island. It was the last oceangoing watch the officer ever stood, his gross negligence is a foregone conclusion. Alleging the occurrence of a navigational error that could not be imputed to them, the shipowner and operator of the "A. Regina" petitioned for limitation of liability under 46 U.S.C.App. sect. 181 *et seq.* for all damages occasioned by the grounding and subsequent abandonment of the vessel on the reef.

Most of the passenger claimants and the United States have extrajudicially settled their personal injury and oil cleanup cost claims, respectively, and did not participate in the hearing on the limitation petition. Actively seeking denial of the petition to limit the owner's liability to the present value of the "A. Regina," or zero, are the Commonwealth of Puerto Rico and the Commonwealth Environmental Protection Board, who claim that the vessel's initial collision with and continued scraping of the reef and its leak of noxious fluids have

damaged the reef and the surrounding natural habitat. Following the hearing held November 2–5, 1987, and the filing of post-trial memoranda by the parties a month later, the petition for limitation stood submitted. This opinion and order resolves the limitation petition only. Damages issues were not presented at the hearing.

## I.

### FINDINGS OF FACT

1. The M/V "A. Regina" is a 330–foot, 3,658–gross ton carferry which sailed under the Panamanian flag. It is owned by copetitioner Armatur, S.A. The vessel plied the seas between Mayaguez, Puerto Rico and San Pedro de Macorís, Dominican Republic, with copetitioner Tourship Co., S.A. operating a ferry service from November 21, 1984 through February 15, 1985. Prior to commencement of the ferry service, the U.S. Coast Guard conducted a mandatory inspection of the vessel and determined that the vessel was in compliance with all safety regulations.

2. The "A. Regina" contained all necessary navigational equipment including two radars, a radio direction finder, an echo sounder, a gyro compass, a magnetic compass, and the equipment needed to engage in satellite and celestial navigation. With the exception of the starboard radar, which was down, all of this equipment was fully operational at the time of the grounding. The incapacity of the starboard radar had no effect on the radar navigation capability of the vessel. One operating radar is fully efficient and capable.

3. The "A. Regina" left the dock in Mayaguez at 2135 on February 14, 1985. On board were 72 crew members, 143 passengers, and 31 automobiles. The crew members included as deck officers Captain Ascenzio Bessone, First Officer Fabrizio Boccenti, and Third Officer Vinicio Montero. The Second Officer had remained in San Pedro that morning of the 14th, taking a day off with the approval of the Captain. Another third officer, Manfredonia, had disembarked upon arrival in Mayaguez and returned to Italy.

4. Captain Bessone possessed Italian and Panamanian master's licenses. There is no dispute that he was fully qualified, capable, and experienced to command the "A. Regina." He had been master of the vessel since 1979. Second Officer Boccenti held an Italian license and may or may not have held a Panamanian license. As both Panama and Italy are signators to a certain maritime treaty dealing with licensing matters, it was generally agreed that it would have been a mere formality for Boccenti to obtain a Panamanian license. Third Officer Montero held only a Dominican license. It was not resolved at trial whether or not Montero could have obtained a temporary Panamanian license based on experience. The Dominican Republic not having signed the aforementioned treaty, it would have entailed something more than mere formality for Montero to obtain a permanent Panamanian license.

5. After clearing the Mayaguez Harbor entrance buoys at 2150, the Captain rang up 16 knots and turned the vessel onto a 255° gyrocompass course. The course and speed remained unchanged until just before the grounding. The Captain always chose the route to take, based on his evaluation of the prevailing conditions. Sometimes he chose to pass Mona on the north. The 255° course was laid out permanently on a chart on the bridge and would, if tracked exactly, provide a passage one mile south of Mona Island. First Officer Boccenti testified that the permanent course plot of 255° or (75°) was the course used for the San Pedro de Macorís to Mayaguez southerly route. He did not know the usual southerly course for the return passage because it was not his watch. He did not remember seeing the Captain plot a different track line on February 14.

6. The Captain did not stand scheduled watches. Usually he would guide the vessel out to open sea, sleep during night passages, and then arise to pilot the ship into the harbor. But on the fateful voyage, with its reduced complement of officers, the Captain stayed on the bridge and took the first watch. The plan was to stand watch until Mona Island was passed

sometime after 000, then hand over the conn to the Third Officer, who would take the 000–0400 watch. It was to have been Third Officer Montero's first regular, unsupervised watch. The First Officer was to have been Montero's relief.

7. The sea and weather conditions on the night of the 14th were a 4 on the Beaufort scale, rather fair for the Mona Channel, which can become very treacherous with high seas. A southerly wind blew at 8 to 12 knots. The night was clear, with visibility at 8 to 10 nautical miles. The pilot chart for February 1985 showed a prevailing current velocity of .7 knots setting northwestward, not uncommon for the channel. The set and drift of the vessel due to the prevailing conditions on the 14th would have tended to put the vessel north-northwestward of its intended course—in the direction where Mona lay.

8. The trip between San Pedro de Macorís and Mayaguez was 128 nautical miles and took from 7 to 9 hours depending on conditions and direction of the crossing.

9. Between the west coast of Puerto Rico, where Mayaguez is located, and San Pedro de Macorís almost due west lies Mona Island. Mona is about six nautical miles by 4 nautical miles in size. It rises dramatically from the sea up whitish cliffs on three sides to a plateau 175 feet above sealevel. In daytime it is highly visible for miles around and at all times is considered an excellent radar target. The light from an automated lighthouse on its north coast has a nominal range of 14 nautical miles, but becomes occluded by the cliffs when approached from the east, the direction from which the "A. Regina" plowed late February 14, 1985. The range of occlusion varies with the height from which it is viewed.

10. On the bridge as the vessel crossed the channel were the Captain and an able bodied seaman. Because the vessel was steering on automatic pilot, the seaman was serving as lookout. No other lookouts were posted. Both men saw the loom of the Mona light come up over the horizon. Though the light itself was occluded the loom remained visible.

11. At no time did the Captain take any fixes with the various navigational aids at his disposal. In this manner he could have pinpointed his exact location.

12. Standard operating procedure on the "A. Regina" was to set the course and then verify conformity with it by taking occasional fixes. If there was a discrepancy, caused, for instance, by the effects of current or wind, steering adjustments would then be made. The Captain testified it was the procedure he had always followed, except on the night of the grounding. On that night he was navigating by sight.

13. Though no physical copies of standing orders were recovered from the wreck, there appear to have been such posted on the bridge. These standing orders required that any passage of land be at a "safe" distance. First Officer Boccenti testified that the orders further required that fixes be taken at the changing of a watch and whenever necessary. The Captain stated that a fix was required every 30 minutes. In any event, neither the "necessary" nor the 30 minute rule was followed. No fixes were taken.

14. As the ship unsuspectingly approached Mona the Captain testified that two lights appeared a few degrees off the port bow. Based on the movement of the lights viewed from the Captain's vantage point, he surmised that they were a vessel's lights, perhaps crossing his bow. He continued to monitor the position of the lights closely with his binoculars and committed much of his attention to them. Though the "A. Regina" continued closing inexorably on Mona, the Captain had not yet descried it. Still he took no fixes. A routine check of his radar console would have informed him of the source of the lights as well as the dangerous proximity of Mona. In a deposition taken in May 1987 the Captain stated that he now realizes that the lights he took for a moving vessel were actually stationary on Mona.

15. Finally, and suddenly, at 0020 on February 15, 1985 Captain Bessone saw reflected on the water the shadow of the cliffs of Mona. He rushed to the radar

console and took his first fix of the voyage.[1] It was too late. The vessel was already practically on top of Mona at 400 meters. The Captain ordered the helmsman hard a port. In a matter of seconds the "A. Regina" met her tragic fate—helplessly grounded on the southern shoals of Mona Island.

16. Efforts were made to float the vessel, to no avail. The passengers and crew were evacuated to Mona and eventually airlifted to Mayaguez.

17. The immediate cause of the grounding was the Captain's inexcusable failure to adjust the course of the vessel to take into account the normal and predictable effects of set and drift in the channel. The Captain's failure to take fixes prevented him from determining that the ship's unadjusted course was putting it into imminent danger of running headlong straight into the island. At no time, at the initial Coast Guard hearing held on February 25–26, 1985, at the Captain's deposition of May 20, 1987 in Italy, or at trial, did the Captain or anyone else ever explain how, given the prevailing conditions tending to push the ship northward, it could have been expected that steering an unadjusted 255° course would bring the "A. Regina" clear of the southeastern edge of Mona. In answer to this very question posed at the Coast Guard hearing, Captain Bessone replied simply that he was proceeding by sight navigation. The inference was that he was waiting to see Mona before adjusting the course. You see something, you steer around it. That is sight, or "eye-ball," navigation.

Nevertheless, the Captain should have known that course adjustments needed to be made at some point in the passage before reaching Mona, and that at that particular stage of the passage,[2] it would not have been surprising to have already reached Mona. Moreover, why would the Captain consciously employ sight navigation when, by his own testimony, he was not even able to discern Mona, but only its shadow, at 400 meters on a clear night? He had been passing Mona nightly for over two months and must have known its visibility characteristics. Something does not jibe in Captain Bessone's recounting. Either he did not intend to navigate without radar, but did, or Mona was visible from a much greater distance, but he did not see it. Under either scenario, Captain Bessone's contention that he was on the bridge drinking coffee, feeling somewhat tired, but otherwise in a normally alert state of mind, is seriously called into question. (Coast Guard hearing, tr. 56, 66.) Failure to utilize the radar as intended or to see Mona can only be attributed to a grave procedural irregularity, such as falling asleep, being absent from the bridge, or total mental incapacity to concentrate on the task at hand.

Unfortunately, the Court has only the Captain's testimony to go on. The testimony of the only other person on the bridge at the time of the grounding who might know what actually transpired, Marte, the helmsman/lookout, was not transcribed.[3] Regardless of what really happened to Captain Bessone on the night of February 14–15, 1985, his actions amounted to gross negligence if not wanton recklessness. The Captain could not have more assuredly destroyed the finest vessel in the ferry company's fleet if he had tried.

18. Captain Bessone had been ill for about a month before the accident. It was a chronic ailment, fatigue and a slight fever that had gradually degenerated into a cold with a persistent and heavy cough. It had put him in bed. (C.G. hearing, tr. 112).

1. Indeed, the radar range was set at 12 miles, too broad to get a picture of Mona from so close due to the "sea return." The Captain had to quickly adjust the range before taking a fix.

2. The Captain testified that around 0030 or 0045 was a normal time to pass Mona.

3. Both the Coast Guard Report and the NTSB Report, *infra*, refer to the testimony of Marte and one Neri, an electrician who were supposedly on the bridge and the port wing, respectively, at the time of the grounding. While there is ample evidence that Neri was on the bridge immediately after the grounding (C.G. hearing Tr. 212, 336), Captain Bessone does not mention his presence before. (C.G. hearing tr. 52, 57, deposition of Bessone July 8, 1987, direct examination, tr. 58.)

After the grounding he was diagnosed as free of any serious illness.

The Captain had been taking antibiotics and a liquid cough suppressant, which he presumed contained codeine, during the week preceding the accident. He swigged it directly from two bottles he had in his cabin. The bottles came from the ship's pharmacy, access to which the Captain controlled. Though he could not remember the exact amount of cough syrup he consumed on the 14th, he estimated that it was an amount equivalent to the spread between his thumb and forefinger.[4] He allowed as it was much more than the directions indicated.

The chemical composition of the particular brand of cough suppressant was never conclusively established. An NTSB toxicologist reported that nothing in the antibiotics would have impaired the Captain's performance. (NTSB report, p. 8.) Though the toxicologist could not render an opinion on the effects of the cough medicine without knowing its contents, a consulting physician stated that if the syrup contained codeine it could have made the Captain sleepy and groggy, and his mind clouded. This may have been especially true in the Captain's case, since he was a teetotaler. The Captain assumed the medicine contained codeine because it successfully inhibited his cough. Lacking more scientific proof, the Court finds that the Captain's assumption, based on his sensory impressions of the effects of the medicine on him, and credibly revealed at both the hearing and his subsequent deposition, indicates that the cough syrup contained codeine.

19. Captain Bessone had been unable to sleep during the night preceding the night of the grounding. The Captain attributed it to a combination of fatigue and a certain agitation or restlessness. (C.G. hearing tr. 30–31.) Captain Bessone disclaimed being unduly sleepy or tired at the time of grounding, despite having been awake for 42 continuous hours.

20. Captain Bessone did not see a doctor with regard to his cold before the grounding, even though, according to the uncontradicted testimony of Tinacci, doctors were available in both Mayaguez and San Pedro to care for the crew. He administered himself cough suppressant and antibiotics. At the Coast Guard hearing Captain Bessone could not remember the last time he had had a legitimate medical examination, it had been so long. The annual company checkups and the checkup he underwent before leaving Italy in October 1984 were cursory, question-and-answer affairs. (C.G. hearing tr. 126–127.) His testimony during his deposition two and a half years later that he had been given regular physical examinations in the spring and fall of 1984 is not credible in light of his more candid, less considered revelations at the Coast Guard hearing.[5] Regardless, it is uncontested that Captain Bessone did not see a doctor during his month of illness preceding the grounding.

21. Captain Bessone had been working continuously for almost a year. He commanded the "A. Regina" during its usual summer season in the Mediterranean from April through September 15, 1984. Rather than enjoying the usual offseason hiatus, after about six weeks in port and drydock preparing the ship for its newly appointed rounds, the Captain sailed the vessel across the Atlantic to initiate ferry service between the Dominican Republic and Puerto Rico. He was scheduled to be relieved on March 1, 1985. As it turned out, that was two weeks too late.

Though petitioners asserted that Captain Bessone had taken an unscheduled week-long holiday at the end of January 1985, the weight of the evidence is contrary. When asked at the Coast Guard hearing if he "had had any days off since bringing the vessel from Europe," the Captain replied negatively. (Tr. 111-2.) The Captain's signatures in the ship's log corre-

---

4. The captain's seeming estimation of half a quart, or 16 ozs., is not reliable. He later clarifies he meant half a bottle. Neither the bottle size he then indicated or the above-mentioned finger spread lead to the conclusion that he consumed 16 ozs.

5. Captain Bessone is no longer an employee of either petitioner.

sponding to each of the days from January 15 to the date of the accident supports the veracity of this initial disclosure. The log further indicates that the Captain last enjoyed a leave from the vessel from August 25, 1984 to September 3, 1984. Captain Bessone's statement at his deposition in May 1987 and the trial testimony of Captain Tinacci to the effect that Bessone stayed a week at the end of January in Tinacci's house while sightseeing in the Dominican Republic, while Tinacci relieved him as Master on the "A. Regina," are not credible. This baldly discredited testimony seriously calls into question every statement made by Tinacci which is not corroborated by independent evidence.

22. Captain Stefano Tinacci was the owner's representative for Caribbean operations. He lived in the Dominican Republic, but often travelled to Puerto Rico, especially at the commencement of service. Captain Tinacci is a fully licensed master and had been in command of the "A. Regina" immediately preceding Bessone's assignment in 1979. In addition to being available to relieve Bessone, it was Tinacci's job to make sure the "A. Regina" was fully equipped and seaworthy and generally to handle the shore side of the ferry operation. He met with Captain Bessone on a daily basis, usually in San Pedro, but at times in Mayaguez as well. They would discuss routine matters and any problems the vessel or Bessone might be having.

Captain Tinacci was aware of Captain Bessone's chronic cold, though he did not consider it serious. He testified that at no time did Captain Bessone ask to be relieved on account of illness. He met with Bessone, as usual, on the morning of February 14 while the vessel was docked in San Pedro. After the vessel was grounded, Tinacci was instrumental in airlifting the passengers and crew off Mona.

23. From November 21, 1984, the maiden Caribbean transit, to January 14, 1985, the "A. Regina" operated on the following daily schedule. Leave San Pedro de Macorís 1000, arrive Mayaguez 1730. Leave Mayaguez 2130, arrive San Pedro de Macorís 0700. This resulted in a daily round trip with only seven to eight hours in port. With the loading and unloading of automobiles, passengers, and supplies, the work was nearly nonstop. Captain Bessone testified that he did have a little time in port under this schedule to attend to personal matters and take a walk on the dock.

On January 15, 1985 the "A. Regina" arrived at a drydock in San Juan, where it remained until January 18. It resumed daily round trips. From February 5 through February 8, the ferry made only a one way trip, without return, each day. Captain Tinacci explained that the high season being over, the schedule was reduced Tuesday through Friday. Daily round trips were accomplished the weekend of February 9–11. There were one way passages on February 12 and 13. Valentine's Day February 14, a holiday, meant a round trip in 24 hours. It was the return trip from Mayaguez to San Pedro de Macorís on Valentine's Day, 1985 that was to be the final voyage of the "A. Regina".

## II.

### CONCLUSIONS OF LAW

Petitioners filed the present action seeking to limit their liability for damages caused by the wreck of the "A. Regina" on the reef fringing Mona Island. A shipowner may limit its liability to the value of the vessel after the wreck if the act or omission causing the damage occurred outside of its "privity and knowledge." 46 U.S.C.App. sect. 183(a). The Commonwealth and its environmental board bring claims, subject to limitation, for recovery of damages to the reef and to the symbiotic surrounding wildlife, including two species of sea turtle which are "federally designated" and "threatened," respectively. See *Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652 (1st Cir.1980). Claimants allege that the damage is ongoing and could reach disastrous proportions if and when the abandoned, listing vessel is broken up by the steady pounding of the rough seas. Because the "A. Regina" is valueless in its present state, a prerequisite to pressing claims for damages to these priceless resources is that the shipowner be

denied limitation of liability under the statute.

## A.

It is fair to say that the Limitation of Liability Act is not the most acclaimed statute ever put into the books.[6] Congress enacted the statute in 1851 as means to make American merchant shipping competitive with the dominant British, who already enjoyed a measure of liability protection. Early liberal judicial interpretations of the statute, as supplemented by the "general maritime law," soon resulted in much greater protection to shipowners than available in Britain. The purpose was served; American shipping benefitted. As commercial relationships changed over time, however, enthusiasm for the statute waned. The widespread use of Protection and Indemnity insurance and the corporate form has offered shipowners layers of liability protection unknown in 1851. Liberal interpretation of the Act was no longer necessary.

Judicial expansion of the Limited Liability Act seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by injured persons. *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 437, 74 S.Ct. 608, 622, 98 L.Ed. 806 (1954) (Black, J., dissenting). In a similar vein, the Act has been described as "hopelessly anachronistic." *University of Texas Medical Branch at Galveston v. United States,* 557 F.2d 438, 441 (5th Cir. 1977), *cert. denied* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978). Most reported decisions in limitation cases since *Maryland Casualty* have been adverse to the shipowner. Gilmore & Black, *The Law of Admiralty,* 2d ed., p. 822. Yet, despite its almost universal condemnation by the commentators and its restrictive application by the courts, the Act has not been repealed by Congress. We are bound therefore to apply it in this case consonant with its application in other cases.

The first step is to determine what acts of negligence or conditions of unseaworthiness caused the accident. The burden of proof is on the claimant. In this case, however, it is undisputed that the Captain's failure to employ standard navigational practices was the immediate cause of the accident. Proceeding to step two, the burden is on the shipowner to prove that it lacked privity and knowledge of the acts of negligence or the unseaworthiness which led to the accident. *Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943). The standard is an objective one; the shipowner is charged with knowledge it should have obtained. *Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558, 1564 (11th Cir. 1985).

In this case the Commonwealth claims that the shipowner and operator of the "A. Regina" possessed privity and knowledge of the ship's unseaworthiness in two respects. The Commonwealth argues that the ship was inadequately manned. Because Third Officer Montero did not have a Panamanian license, he did not qualify as an officer, and therefore the ship lacked one of three requisite officers. The Commonwealth also argues that the Captain's physical condition rendered the vessel unseaworthy.

Courts find privity and knowledge where a ship was in an unseaworthy condition due to an incompetent or inadequate crew. *See Horn v. Cia. De Navegacion Fruco, S.A.,* 404 F.2d 422, 431–32 (5th Cir.1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969); *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151 (2nd Cir.1978). Another way of stating this principle is that the shipowner has a duty to ensure that the ship is seaworthy, or, in this case, adequately and competently manned.[7] In cases in which navigational

---

**6.** The brief history of the Limitation Act which follows was culled from various sources, most notably Gilmore & Black, *The Law of Admiralty,* 2d ed., sect. 10–2—10–4(a).

**7.** The concepts of negligence (and duty) and seaworthiness overlap and are often used interchangeably. *See Hercules Carriers,* 768 F.2d at 1564, n. 3; Gilmore & Black, sect. 10–24.

error was a direct cause of the accident, a shipowner will be denied limitation of liability if the unseaworthy condition caused the navigational error. On the other hand, if the navigational error was caused by the instantaneous negligence of the crew or captain, the shipowner cannot be charged with privity and knowledge. A shipowner is not required to make the ship "failsafe." *Farrell Lines, Inc. v. Jones*, 530 F.2d 7 (5th Cir.1976).

Seaworthiness is defined as reasonable fitness to perform or do the work at hand. Missing and nonfunctioning navigational equipment are common and easily identifiable sources of unseaworthiness. *See States Steamship Co. v. United States (The Pennsylvania)*, 259 F.2d 458 (9th Cir. 1957, 1958), *cert. denied*, 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305 (1959) (hull prone to cracking); *Zoe Colocotroni, supra*, (no charts on board, inoperative gyrocompass, fathometer, radio direction finder, and radar); *Waterman Steamship Co. v. Gay Cottons (The Chickasaw)*, 414 F.2d 724 (9th Cir.1969) and *Complaint Of Thebes Shipping, Inc.*, 486 F.Supp. 436 (S.D.N.Y. 1980) (radio direction finders inoperative); *Matter Of Texaco, Inc.*, 570 F.Supp. 1272 (E.D.La.1983) (charts not updated, radar interference not corrected). Company policy can also render a vessel unseaworthy. *See Hercules Carriers, supra*, (unwritten company policy to defer to pilot led, among other causes, to unseaworthy condition causing accident); *State Of Oregon State Highway Commission v. Tug Go–Getter*, 468 F.2d 1270 (9th Cir.1972) (failure to use two tugs instead of one unseaworthy despite local custom of using only one tug).

An incompetent crew can render a ship as unseaworthy as inoperative navigational equipment or structural defects. The shipowner has a duty to properly train the crew in the operation and capacities of the vessel and its navigational equipment. Failure results in a denial of limitation if the navigational error was caused by a lack of training. *Tug Ocean Prince, Inc. v. United States, supra; Complaint Of Seiriki Hisen Kaisha*, 629 F.Supp. 1374 (S.D.N.Y. 1986). Inexperience of the master and the crew is also imputable to the shipowner.

*Tug Ocean Prince, supra; Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204 (5th Cir.1968) (master totally unfamiliar with waters in which he was navigating); *Admiral Towing Co. v. Woolen*, 290 F.2d 641 (9th Cir.1961) (17 year old deckhand inexperienced and incompetent).

In this case, claimants do not allege that the crew was inherently incompetent. Captain Bessone was eminently qualified to be master of the "A. Regina." Even accepting for the moment claimants' argument that Third Officer Montero was not qualified, the rest of the crew included a sufficient number of admittedly qualified officers. Claimants' theory is not based on a chronic condition of unseaworthiness, but on a relatively sudden or fleeting lack of fitness to perform the ferry voyages due to Captain Bessone's incapacitating illness. A captain may be incompetent by reason of illness, rendering the vessel unseaworthy and incurring the liability of the shipowner if it had privity and knowledge. *Empresas Lineas Maritimas Argentinas, S.A. v. United States*, 730 F.2d 153 (4th Cir.1984).

We have stated that generally instantaneous negligence such as navigational error is not within the privity and knowledge of the shipowner. But if the error resulted from an unseaworthy condition, such as an incompetent crew, there is privity and knowledge. If the crew was incompetent, an issue which we have not yet resolved in this case, the additional question arises of whether the incompetence was so "instantaneous" as to shield the shipowner from liability. The answer to this question implicates the level of management control over shipping operations.

As stated in one case, a purpose of the limitation statute is to protect "the physically remote owner who, after the ship breaks ground, has no effective control over his waterborne servants." *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir.1977). The traditional idea is that once the ship leaves port, the shipowner loses all effective control over the ship's operation. While in this age of modern telecommunications and transportation the distinction seems crude, the underlying notion remains

valid. At some point in a voyage, or for certain operations, the shipowner has no ability, and therefore no duty, to control the vessel. The inquiry therefore focuses on the level of control exerted or which could have been exerted. In cases involving corporate ownership, as here, the level in the corporate hierarchy from which the control was exerted is important. Gilmore & Black, p. 885.

In *Spencer Kellogg & Sons, Inc. v. Hicks (The Linseed King)*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932) the Captain of a ferry crossing the Hudson River had been generally instructed not to operate when ice floes were present because the vessel would be unseaworthy. He tried to cross on an icy day anyway and the launch sank. The Supreme Court denied limitation, noting the local character of the operation and holding that a certain managerial employee had the authority and should have known of and acted to prevent the attempted crossing. It was not an emergency situation arising during the course of the passage which the master had to meet alone. The negligent act consisted of setting out from the dock, an act over which the shipowner had control.

■ The main lesson to be gleaned from *The Linseed King* is that duty to control increases proportionally with the possibility of control. *See also, Avera v. Florida Towing Corp.*, 322 F.2d 155 (5th Cir.1963). Ferry service across a river is not an expansive undertaking and is susceptible to much oversight. Obviously a shipowner cannot insulate itself by consciously failing to exert control where it could and should. *The Chickasaw*, 414 F.2d at 732. The ability, and duty, to control therefore increases with more restricted operations. *Matter Of Texaco*, 570 F.Supp. at 1278.

> The great majority of the cases denying limitation of liability have involved old barges, tugs, and other vessels obviously more capable of control by the home office than a freighter thousands of miles away ...

In contrast, limitation of liability has been granted much more often where the vessel involved was a large ship and the negligence did not occur in the home port or in a drydock.

*The Chickasaw, supra*, at 733. In a restricted operation not far from management's locus of control the shipowner is held to a higher duty.

### B.

■ We reiterate that the immediate cause of the grounding was Captain Bessone's navigational errors. Applying the legal standards noted above to the facts, we further hold that these errors were a direct result of his incompetence to captain the vessel on the day of the grounding. Moreover, the Captain's incompetence rendered the vessel unseaworthy from the inception of the voyage and was a condition that should have been known and ameliorated by the shipowner. The shipowner's negligent failure to control the operation of the "A. Regina" proximately caused its grounding.

The most salient fact pointing to the shipowner's fault is the inhumane schedule which the Captain was forced to keep. After captaining the vessel for the duration of its usual summer ferry schedule in the Mediterranean, Bessone turned around and brought the "A. Regina," for the first time, to the Caribbean for the winter season. Winter was usually down time for the ferry and its crew. A time to rest and spend with the family. Instead, without a significant break, Captain Bessone was sent across the ocean to work another season with a full schedule, this one in unfamiliar waters. And the schedule was grueling. A daily round trip of 256 nautical miles. This translated to as little as six to eight hours per day in port.[8] The evidence indicated that Captain Bessone had not had one day off from this exhausting routine since he arrived in the Caribbean. That would be a demanding schedule for anyone. For a person who had been master of an oper-

---

**8.** The schedule reduction in early February to a one way trip per day had been applicable to

only six days at the time of the accident.

ating ferry for almost a year without break, it was too demanding.

Given this work schedule, it is no wonder that Captain Bessone began to wear down, physically and mentally. The Captain had been suffering from symptoms of a cold, fever, and fatigue for a month preceding the grounding. For the week preceding the grounding his condition had deteriorated into a persistent and heavy cough which could be quelled only by ingestion of codeine-based cough medicine in dosages exceeding those recommended on the bottle. The night preceding the night of the accident, the Captain's cough and fatigue had left him agitated and restless, unable to sleep. It is not surprising, given the Captain's accumulated lack of sleep, continuous time at sea, and generally fatigued physical and mental condition, that he could not concentrate while on the bridge on the night of the grounding. The effect was to render the vessel unseaworthy.

Petitioners respond to claimants' allegation that the Captain was sick and unable to command the vessel on February 14, 1984 by pointing out that at no time before the accident did he request to be relieved or to see a doctor, or indicate that he was seriously ill. The owner's representative,[9] Captain Stefano Tinacci, was in constant contact and was available to relieve him. Though we have held that the evidence does not support petitioners' assertion that Tinacci had actually relieved Bessone for a week at the end of January 1985, it is undisputed that he was fully capable of doing so. All Captain Bessone had to do was ask for a holiday. He never did. Petitioners argue therefore that not only was the Captain's competence not compromised by his physical condition (we hold differently), but even if it was, they had no way of knowing.

■ This argument fails in two respects. First, the Captain's diminished capacities were a direct result of petitioners' actions.

The Captain became unfit as a result of the grueling schedule. Second, Captain Tinacci met almost daily with Captain Bessone. They would discuss day-to-day operations. Captain Bessone took orders from Captain Tinacci. It was a highly restricted operation, more analogous to tug and harbor ferry service than an oceangoing freighter. The schedule was very regular and the voyages relatively short. The owners' representative exerted direct, hands-on control between the short voyages. Captain Tinacci controlled all aspects of the ferry service, except for the actual maneuvering of the vessel during a voyage. Furthermore, it being the first time the company, Tinacci, and Bessone had been involved with ferry service in the Caribbean, the level of management control was particularly high.

On the morning of the accident Bessone and Tinacci met in San Pedro. Tinacci knew that Bessone was battling a chronic cough. Tinacci knew about the Captain's grueling schedule. Indeed, he had engineered it. Given this knowledge, and the restricted nature of the first time ever ferry service, over which the shipowner was able to and actually did exert strict control, the shipowner was in privity with and had knowledge of the Captain's incompetence due to his weakened physical condition. Though the grounding resulted from navigational errors committed by Captain Bessone during the course of a voyage, the navigational errors are attributable to Captain Bessone's illness, his fatigue from overwork, and the medicine he was taking. All of these conditions should have been known by Captain Tinacci, the owners' representative. His negligence consisted of allowing the vessel to leave San Pedro on the morning of the 14th with Captain Bessone in command. The ship was unseaworthy in that state. The shipowner was also negligent in overworking the Captain, which contributed to his deteriorated health.

Here, there is no dispute that Captain Tinacci was the owner's sole representative in the Caribbean and had the authority to act for the corporation.

---

**9.** Often in cases in which a corporate owner is seeking limitation of liability a large issue is whether the particular managerial employee who has privity and knowledge is sufficiently high in the hierarchy to bind the corporation.

With only the bare minimum number of officers aboard when the ship left Mayaguez, the incapacitating illness of any one of them would have rendered the vessel unseaworthy. This is especially true if the sick officer happens to be the master, who is responsible for the safe operation of the vessel. This unseaworthy condition, while not as permanent as a structural defect, had persisted long enough for the shipowner to be aware of it. With only three officers aboard, including a Third Officer who had yet to stand his first unsupervised watch, it became necessary for the Captain to perform a task which circumstances soon proved him incompetent to perform—stand watch on the bridge.

### C.

Both parties urge *Empresas Lineas Maritimas Argentinas, S.A. v. U.S., supra,* as support for their positions. *Empresas* is the only case cited by either party which involved allegations of unseaworthiness due to the illness of the captain. The commanding officer of a Coast Guard cutter had been suffering from an undiagnosed pulmonary infection for six months prior to his vessel's collision with another vessel on a clear night. He too, like Captain Bessone, saw lights and misapprehended their source. He had been visiting Coast Guard medical and allergy clinics regularly complaining of coughing, congestion, and sleeplessness. A list of those reporting for sick call circulated daily among the base higher ups. Based on these facts, the court charged the captain's superiors with knowledge of his deteriorated physical condition and sleeplessness.

Petitioner's attempt to distinguish *Empresas* from the instant suit is not persuasive. It is true that in contrast with the Coast Guard captain's eventual diagnosis, it was determined that Captain Bessone suffered from no serious illnesses. It is also true that the captain in *Empresas* had been complaining of illness for over six months. But it is not true, as petitioners assert, that Captain Bessone had only been suffering from a cold for "three to six days" prior to the accident. In fact,

though Captain Bessone had been taking cold medicine for only about a week, his physical condition had been gradually deteriorating for about a month prior to the accident. And though Captain Bessone's name did not appear on a sickcall list, if anything, his superior was in closer contact than were the Coast Guard captain's superiors in the chain of command. Bessone and Tinacci met daily. Captain Bessone's superior and the shipowner are thus held to at least as high a duty as was the Coast Guard. Moreover, the captain in *Empresas* received medical care at irregular intervals, although unavailing, while Captain Bessone had not undergone a physical exam since he could not remember when. This evinces a greater degree of negligence than that present in *Empresas*. Finally, in *Empresas*, unlike the present situation, there is no indication that the captain had been overworked, and by those same persons in the hierarchy charged with privity and knowledge of his incompetence.

### III.

◼ The other theory of unseaworthiness urged by claimants does not hold water. Claimants argue that the "A. Regina" was insufficiently manned because the Third Officer did not hold the proper licenses and was therefore unqualified. Claimants failed to establish this at trial. As a threshold, claimants failed to prove what the Panamanian manning requirements for the "A. Regina" were. The testimony given at the Coast Guard hearing of a supposed expert on Panamanian maritime law regarding qualifications was not admitted at trial for several reasons. The expert was never announced as a witness. Claimants never submitted copies and certified translations of the foreign laws sought to be interpreted, as ordered by the Court. Finally, the page of transcript detailing the witness' qualifications as an expert is missing from the record.

Even if the Court had admitted the expert's testimony, his conclusion as to whether the Third Officer was or was not qualified under Panamanian regulations was that it was "questionable." (C.G.

hearing tr. 296.) He was not decisive on the issue of whether the Third Officer could have obtained a temporary Panamanian license by virtue of his experience. This would have made the license a "mere formality," not unlike the situation of First Officer Boccenti, whose qualifications have not been questioned.

Even assuming Third Officer Montero was not qualified for a Panamanian license, which was not shown at trial, this fact would not conclusively prove that he was incompetent. Claimants offered no evidence pertaining to the seamanship skill of Montero. Finally, even if Montero was incompetent, this fact would have had no effect on the grounding. Captain Bessone, not Montero was on watch on the bridge when the ship struck the reef. The Captain was not standing Montero's watch because Montero was incompetent. He was not standing Montero's watch at all. He was standing Boccenti's. Montero was scheduled to relieve Bessone. As things turned out, the "A. Regina" probably would have been better served if Montero, and not the Captain, had been on watch for the passing of Mona Island.

## IV.

The final matter incumbent upon us to consider at this time is the admissibility of the Coast Guard report, the National Transportation Safety Board (NTSB) report, and related documents. Over petitioners' objections the factual portions of the reports were admitted, along with most of the transcript of the hearing upon which much of the reports are based. Excluded were the opinions and conclusions reached in the reports and the hearing testimony of the expert on Panamanian law. Petitioners move for reconsideration of the ruling on admission.

The general rule is that the factual findings of Coast Guard and NTSB reports are admissible if based on trustworthy sources, while evaluative conclusions are not admissible. Fed.R.Ev. 803(8); *Travelers Ins. Co.*

v. *Riggs*, 671 F.2d 810, 816 (4th Cir.1982) (NTSB report); *Smith v. Ithaca Corp.*, 612 F.2d 215, 220–223 (5th Cir.1980) (Coast Guard report). As to hearing transcripts, they are hearsay and are admissible as a former testimony exception only if the witness is "unavailable." Fed.R.Ev. 804(b)(1); *Complaint Of American Export Lines, Inc.*, 73 F.R.D. 454, 1977 AMC 2632, 2638–40 (S.D.N.Y.1977).

In this case, though the Court properly admitted the factual findings of the reports and excluded the conclusions, in no way were the factual findings blanketly adopted. Instead, they have been treated merely as additional evidence, to be accorded whatever weight they merit. Each of the Court's finding of facts was arrived at separately and independently of the reports and by reference to the entire body of evidence, including the transcripts of the hearing. Petitioners argue that the transcripts' inherent unreliability and untrustworthiness render inadmissible both themselves and the factual portions of the reports, which were based primarily on the hearing.

The main area of attack is on the translations. There were problems. The interpreter was not a professional. At times he paraphrased testimony when he translated. Often he forgot to maintain the witness' point of view by translating word for word. For instance, he would translate "he went" when the witness actually said "I went." Petitioner points to various inconsistencies in the reports and to subsequent depositions as further proof that the translated testimony on which they were based is unreliable.

Petitioners' argument that their counsel at the hearing was unable to object to the allegedly poor translations being made from Italian to English [10] is undercut by counsel's own actions at the hearing. On more than one occasion, especially during the early stages, counsel interrupted the proceedings to offer a suggestion for a more precise translation of the witnesses'

10. The problem seems to have been confined to the responses of the witnesses and their translation from Italian to English, at least as to Captain Bessone who understood much English (p. 25–26).

responses (see, for example, C.G. hearing tr. 24, 59, 60). These were duly accepted by the investigator. But by and large, the questions and answers were direct and concise, leaving little room for confusion. This is particularly true of those parts of the hearing considered by the Court to be particularly relevant to resolution of the petition for limitation of liability.

Of all of the documents admitted by the Court only the transcript of the Captain's testimony contributed significantly to the decision announced today. From this testimony the following material facts were gleaned. The Captain had not received a medical exam for years or a day off at least since he arrived in the Caribbean. He had not slept the night before the night of the accident. Captain Bessone's responses at the hearing to questions on these matters are clear and their content unequivocal.

By contrast, the snafu over the amount of cough syrup he ingested precluded the Court from making as definite a finding in that regard as the Coast Guard and NTSB reports. The Court found only what the transcript fairly revealed—Captain Bessone took significantly more medicine than was prescribed on the bottle. The inability to more precisely determine the volume appears to have been more a function of the translation from the metric system to the British Imperial System, and the investigator's and parties' failure to pursue specification for the record, than any problem with the English/Italian translation. For this reason, the Court did not echo either of the partially inconsistent factual findings in the two reports concerning this matter.

■ Because the transcript, and the testimony and line of questioning, is inconclusive on the facts of one matter, for whatever reason, does not mean it is inconclusive on all matters.[11] The specific facts the Court derived from the transcript were set out clearly and without confusion in Captain Bessone's testimony. It would be wasteful folly not to use testimony whose content is indisputable because of some general objection to the reliability of the entire hearing testimony.

As for the inconsistency between the Captain's testimony at the hearing and at his deposition as proof of the hearing transcript's unreliability, the Court has already noted the credibility and reliability problems with the deposition. A deposition taken over two years after previous testimony, wherein the deponent takes great pains to alter and clarify his previous testimony, can hardly be used as a bootstrap to question the reliability of the previous testimony.

Petitioners' final stab at keeping the Captain's partially damning, post-collision revelations out of evidence does not even come close to mark. Petitioner would exclude the transcripts because claimant failed to show the unavailability of the witnesses. As to the one crucial witness, however, Captain Bessone, petitioner admits he was unavailable at trial. Therefore, the transcript of his testimony is admissible. Petitioners' vague and desperate attempt to argue that the former testimony could only be used at the deposition of Bessone for impeachment purposes and not at trial is not supported by any authority or reason. The largely insignificant testimony of Second Officer Boccenti was also admitted, as he was unavailable. The testimony of the purported expert on Panamanian law was excluded for the reasons noted above.

WHEREFORE, the petition for limitation of liability is hereby DENIED.

IT IS SO ORDERED.

---

11. Another alleged inconsistency can probably be laid at the petitioners' own doorstep. One of the reports erred in detailing the schedule of the "A. Regina" in the days preceding the accident. Petitioners argue this shows the unreliability of the whole investigative endeavor. More probably, petitioners made the schedule no more clear at the Coast Guard hearing than they did in open court. Only after a review of other documentary evidence was the schedule able to be specified.