In the Matter of **PALMER JOHNSON SAVANNAH, INC.,** as owner of Tug Palmer Johnson, Georgia Registration GA9500LM, in a cause of action of exoneration from, or limitation of, liability, Petitioner.

No. Civ. A. CV496–121.

United States District Court, S.D. Georgia, Savannah Division.

May 20, 1997.

---

8. There are tape recordings made of hearings before magistrate judges.

Gary A. Bubb, Jacksonville, FL, Hermann Coolidge, Jr. and Mary Kathryn Hogan of Ranitz, Mahoney, Coolidge & Mahoney, Savannah, GA, for Petitioner.

George H. Chamlee of Chamlee, Dubus & Sipple, Savannah, GA, for Respondent.

### ORDER

MOORE, District Judge.

Petitioner is proceeding before this Court in an admiralty action in which it seeks to, pursuant to the Limitation of Liability Act, 46 U.S.C. § 181 *et seq.*, exonerate itself from or limit its liability resulting from a mishap at the Palmer Johnson boat basin. Claimants have filed a Motion for Partial Summary Judgment. For the reasons stated below, the motion is **GRANTED**.

### BACKGROUND

Except where indicated, the following facts are not in dispute.

This action arises out of an April 5, 1996, accident in the boat basin of Petitioner's Thunderbolt, Georgia, repair facility. The offending vessel was the Tugboat PALMER JOHNSON which was being operated by Petitioner's employee, Roger Morton. Morton secured the vessel to the dock with three lines and left the vessel's single engine running and propeller turning in an effort to remove, through propeller action, silt and mud from under the boat basin docks—a process known as agitation dredging. Morton left the vessel unattended with the engine running for five minutes before the three lines securing her to the dock snapped in quick succession. The vessel broke away from the dock, unmanned, and rammed three luxury yachts: M/V EDEN BOUND; S/V RUSSE NOIR; and S/V SEA LOVE. The EDEN BOUND's jetboat/tender, the LOVE ME TENDER, was also damaged by the PALMER JOHNSON. The three yachts were moored to Petitioner's dock with Petitioner's consent. The offending vessel is owned by Petitioner. The EDEN BOUND is owned by the Trawler Corporation; the LOVE ME TENDER is owned by Peter Sever; the RUSSE NOIR is owned by Peter Harrison; and the SEA LOVE is owned by Peter Arnold.

Morton was given the title and job assignment of "Operations Manager" by Petitioner's General Manager, Eric Haberli. Morton's business card shows that he is the Operations Manager at Petitioner's Thunderbolt facility. At the time of the incident, Morton had approximately ten employees of Petitioner working under his supervision. The use of the PALMER JOHNSON to perform agitation dredging was a duty assigned to Morton by Haberli.

In his deposition, Morton testified as follows:

Q: And who was aboard the tug at the time it broke loose?

A: Nobody.

Q: Is it your practice to do this work with no one aboard?

A: It has been in the past, yes.

Q: And do you know if Eric Haberli would have know that that practice was being followed?

A: I would assume he does.

Q: Had you ever discussed it with him?

A: No, they did it when I arrived here. When I first started working, that was the way it was done.

Q: Has Mr. Haberli ever been present when you were doing it that way?

A: I can't recall. I don't know.

Q: Was he present on this particular occasion?

A: No.

(September 20, 1996, Deposition of Roger C. Morton, p. 19.) [1]

In his deposition, Haberli attempted to dispute that Morton was the Operations Manager:

Q: Now you said when he first came to Savannah he was operations manager.

A: Yes.

Q: He still is; isn't he?

A: He has not been told he is not yet. Roger is pretty much a foreman right now.

Q: Okay.

A: Okay.

Q: Before you go into that any further, let me ask you—

A: Okay.

Q:—as of April, 1996, was he still operations manager?

A: He was, he was not.

Q: Are you aware that he uses this card that's been identified as Morton Exhibit 1?

A: Yes, I do.

Q: And do you disagree with his title as it's set forth on the card?

A: His title was supposed to be adjusted. There's been an internal problem with me— ...

What we found out is Roger's business skills as a businessman weren't there, but his hands-on working with customers and people was wonderful.

He's in charge of the haulouts, moving those big expensive boats, he does a wonderful job. Captains trust these very expensive boats to his hands, and that's very good.

Upper management decided that he was to be taken away from the operation manager's part of—or the title; okay?

I, myself, have not taken that responsibility to correct him.

Q: In other words, you have not told him—

A: That's right.

Q:—that he no longer has title of operations manager.

A: Operations manager.

Q: And have you taken action to take these business cards away from him?

A: No, because there's a second part of it. Upper management wanted me to correct his salary and I'm having trouble doing that.

(September 20, 1996, Deposition of Eric Haberli, pp. 9–11.)

While Haberli acknowledged that he had previously observed the PALMER JOHNSON performing agitation dredging, he admitted that he had not instructed Morton on the procedure to be followed in performing that task. (Haberli depo., pp. 13–14, 18.) Haberli testified that he was not aware that agitation dredging was being performed with unmanned tugs and that he would have objected to the practice had he known about it. (Haberli, depo., p. 18.)

On May 31, 1996, Petitioner filed its Petition seeking exoneration from or limitation of liability pursuant to 46 U.S.C. § 183. With this Petition, Petitioner filed its Stipulation for Value in which it declared the value of the PALMER JOHNSON to be $35,000.00 and posted a bond for that amount with the Court. On July 10, 1996, this Court preliminarily approved the Petition and enjoined all litigation pertaining to the April 5 accident and directed that any claims arising from that accident had to be brought before the Court or forever lost. In the time allowed for the presentation of claims, four Claimants came forward: Peter Harrison; Peter Arnold; Peter Sever; and the Trawler Corporation.[2]

---

1. In a subsequent affidavit, Morton claimed that he did not mean to imply that the unmanned agitation dredging was a "continuing and ongoing practice" but that it "had been done sporadically in the past." (October 28, 1996, Affid. of Roger C. Morton, ¶ 5.)

2. One other potential Claimant, Ron Hollett, a crew member of the EDEN BOUND, requested the Court to grant him an extension of time to file his Claim/Answer for the assertion of a personal injury claim. Magistrate Judge G.R. Smith granted the motion and reset Hollett's deadline for filing a claim at September 5, 1996. Hollett, however, never filed any Claim/Answer.

The four Claimants filed a Motion for Partial Summary Judgment on October 15, 1996, to which Petitioner has filed token opposition. Through their motion, Claimants ask this Court to rule that Petitioner's liability arising from the April 5 accident cannot be exonerated or limited. This Court now considers the motion.

## ANALYSIS

### I. *When summary judgment is appropriate.*

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir.1991). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [then] there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587.

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992). This Court must avoid weighing conflicting evidence during this endeavor. *Anderson,* 477 U.S. at 255.

Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted). However, if the evidence is merely colorable or not significantly probative, summary judgment may be granted. *Id.*

### II. *Petitioner's liability will not be limited or exonerated.*

▬ A shipowner may limit his liability for any loss, damage or injury by collision to the amount or value of the owner's interest in the vessel if "done, occasioned or incurred" without the privity or knowledge of the owner. 46 U.S.C. § 183. Petitioner may be held liable beyond the value of the PALMER JOHNSON ($35,000.00) "if it had privity and knowledge before the start of the voyage of the acts of negligence or conditions of unseaworthiness that caused the accident. Moreover, [Petitioner] is not entitled to limitation if the ship was unseaworthy due to an incompetent crew or faulty equipment." *Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558, 1563 (11th Cir.1985).

▬ When, as here, a shipowner is seeking exoneration from liability, he must show by a preponderance of the evidence that he, his vessel, and his crew are free from fault. *Matter of Adventure Bound Sports, Inc.,* 837 F.Supp. 1244, 1253 (S.D.Ga.1993). In contrast, a claimant usually must prove fault in action for limitation of liability before the burden of proof shifts to the shipowner to show a lack of privity or knowledge. *Hercules Carriers,* 768 F.2d at 1564. Once a claimant demonstrates fault, the burden of establishing lack of privity and knowledge shifts to the party seeking the benefits of the Limitation of Liability Act. *See Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363 (1943). "If the owner is not exonerated but prevails in his plea for limitation, the section 183 security fund is distributed on a *pro rata* basis and the owner's liability is at an end." *Complaint of Carribean Sea Transport, Ltd.,* 748 F.2d 622, 626 (11th Cir.1984), *modified*

*on other grounds,* 753 F.2d 948 (11th Cir. 1985).

■ In this case, it is abundantly clear that Petitioner cannot and will not be completely exonerated from liability. Indeed, in cases such as this where human error is involved, it is "exceedingly rare to grant exoneration." THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 15–6 (2d ed.1994) (citing *Matter of Oil Spill by Amoco Cadiz,* 954 F.2d 1279 (7th Cir.1992)). In its Petition, Petitioner admits that it employed Morton, that Morton was operating the PALMER JOHNSON, and that Morton's negligence caused the April 5 accident and the resulting damages sustained by Claimants' vessels. (Petition, ¶¶ 4–6, 8.) As Petitioner has admitted that, at the very least, the operator of the PALMER JOHNSON was at fault, it cannot carry its burden necessary to corroborate its request for the relief of exoneration. *Adventure Bound Sports,* 837 F.Supp. at 1253. Therefore, Claimant's motion must be granted as to the issue of exoneration.

■ This Court now turns to the question of whether Petitioner may limit its liability to the $35,000.00 fund in the Court's control.

> [A] determination of whether a shipowner is entitled to limit its liability involves a two-step analysis. As stated in *Farrell Lines, Inc. v. Jones,* 530 F.2d 7 (5th Cir. 1976): "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." 530 F.2d at 10.

*Hercules Carriers,* 768 F.2d at 1563–64.

■ The first prong of the *Farrell Lines* test is, in one aspect, easy to analyze: Petitioner has admitted that Morton's negligence (leaving the Palmer Johnson running and unattended) caused the damage to the vessels owned by Claimants. (Petition, ¶ 8.) In addition to Petitioner's admission, Claimants argue that the lines used to moor the Palmer Johnson to the boat basin dock were not seaworthy as demonstrated by their failure

on the day in question. (Cl.'s Memo., p. 2; Cl's Reply Memo., p. 4.)

■ In response to Claimants' argument pertaining to the mooring lines, Petitioner has presented no legal argument but has submitted an affidavit of marine surveyor H. David Scott who simply stated: "I examined the tug Palmer Johnson and found that all of its equipment, gear and appurtenances were in a condition reasonably fit for their intended purposes and based thereon, I am of the opinion that the tug Palmer Johnson was in all respects seaworthy on April 5, 1996." (October 30, 1996, Affidavit of H. David Scott, ¶ 5.)

■ Scott's affidavit is both inexact and conclusory and, therefore, is insufficient to present a factual issue creating a dispute as to the seaworthiness of the PALMER JOHNSON. When a ship breaks loose from its moorings, a presumption of unseaworthiness is created which the shipowner is required to overcome. *See Martinez v. United States,* 705 F.2d 658, 662 (2nd Cir.1983). To overcome this presumption, Petitioner must show that the departure from the moorings "was the result of an inevitable accident, or a *vis major,* which human skill and precaution, and a proper display of nautical skill could not have prevented." *The Louisiana,* 3 Wall. 164, 70 U.S. 164, 173, 18 L.Ed. 85 (1865). This is a mighty burden which is not easily satisfied. *Martinez,* 705 F.2d at 661.

■ In this case, Morton testified that the mooring lines broke under what he indicated was normal use. (Morton depo., p. 19.) "If a ship's equipment breaks under normal use, the logical inference that follows is that the equipment was defective." *Villers Seafood Co., Inc. v. Vest,* 813 F.2d 339, 342 (11th Cir.1987). The uncontradicted presumption and inference before this Court demand a conclusion that the mooring lines were unfit for their intended purpose; the law extends this status to the vessel, in total, which must now be found to have been unseaworthy. *See Id.; Miles v. Melrose,* 882 F.2d 976, 981 (5th Cir.1989).

■ This Court now looks to the second prong of the *Farrell Lines* test. Because Claimants have easily established neg-

ligence on the part of Morton, the burden of proof now shifts to Petitioner to prove lack of privity or knowledge of such negligence. *Coryell*, 317 U.S. at 609. Having found that, as a matter of law, the PALMER JOHNSON was unseaworthy, this Court must conclude that the benefits of the Limitation of Liability Act are unavailable to Petitioner: "A shipowner may not limit his liability under the limitation act if his ship his unseaworthy due to equipment which was defective at the start of the voyage. He is charged with knowledge of the existence of that condition." *Villers Seafood*, 813 F.2d at 343 (citing *Hercules Carriers*, 768 F.2d at 1563); *see also Horn v. Cia de Navegacion Fruco, S.A.*, 404 F.2d 422, 431–32 (5th Cir.1968), *cert. denied*, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969). Because the PALMER JOHNSON, by virtue of its equipment failure under normal use, was unseaworthy, and because Petitioner had constructive knowledge of the unseaworthy condition, the well settled law of this Circuit requires this Court to declare that Petitioner's liability cannot be limited under the 46 U.S.C. § 183(a). *Villers Seafood*, 813 F.2d at 343. For this reason alone, Claimants' motion will be granted.

 Even if the PALMER JOHNSON had been seaworthy on April 5, Petitioner's liability could not be limited because Petitioner had privity or knowledge of Morton's negligence. As this offending vessel is owned by a corporation, privity or knowledge can be imputed to Petitioner due to the fact that Morton was a supervising authority of the corporation:

> Courts have held corporate ship owners to a stricter standard than individual owners in determining whether they possessed privity or knowledge of a negligent act. *E.g.*, *Hammersley v. Branigar Org.*, 762 F.Supp. 950, 958 (S.D.Ga.1991). An individual owner must personally possess privity or knowledge to be denied limitation of liability. *Coryell*, 317 U.S. at 411; *Gibboney v. Wright*, 517 F.2d 1054, 1057–58 (5th Cir.1975). In contrast, a court may impute to a corporate owner the privity or knowledge "of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the

business out of which the loss or injury occurred." *Coryell*, 317 U.S. at 410.

*Adventure Bound Sports*, 837 F.Supp. at 1255.

In this case, Petitioner has spent much of its sparse argument discussing whether or not Morton actually was the Operations Manager of its Thunderbolt shipyard. In the opinion of the Court, this verbiage amounts to much ado about nothing. "The test of whether it is appropriate to impute privity or knowledge focuses on the managerial authority of the subordinate over the particular aspect of corporate business in which the accident occurred; a court, therefore, will look to ·the subordinate's function over his title." *Id.* In this respect, it is critical that Morton testified that, in addition to supervising the lifting, docking, and launching of boats in the boat basin, (Morton depo., p. 7), he supervised the practice of agitation dredging with the tugboat:

> Q: Your job description has been given to you by Eric Haberli?
>
> A: Correct.
>
> Q: Does it include the operation of the TUG PALMER JOHNSON, does your work include that?
>
> A: Yes.
>
> Q: And what is that tug used for?
>
> A: Used for towing boats, used for blowing and pulling mud out of the basin?
>
> Q: Do your duties include using the tug to pull dirt and mud out of the basin.
>
> A: Yes.
>
> Q: Is there anyone else in the organization that does that besides you?
>
> A: Well, yes. I supervise the people that do that. I don't virtually always drive the tug, no.

(Morton depo., p. 8.)

General Manager Haberli agreed with Morton's assessment of his duties regarding the tugboat agitation dredging: "He's in charge of, as you call it—we call it washing out underneath the docks." (Haberli depo., p. 13.) Additionally, Haberli agreed that Morton was essentially the yardmaster of Petitioner's Thunderbolt facility: "He's the guy that's out in the yard on the firing line.

Something goes wrong, the captains immediately hit Roger first and he either deals with it or he gets the project managers involved." (Haberli depo., p. 13.) In the opinion of the Court, this uncontradicted evidence dictates the following conclusion which must be reached as a matter of law: Morton was vested with discretionary authority over the daily operation of the boat basin and, particularly, over the agitation dredging out of which the complained-of damages occurred. Under *Coryell,* privity and knowledge may be imputed to Petitioner through Morton. 317 U.S. at 410. Because Morton undisputedly had knowledge of his own acts of negligence on April 5, Petitioner is responsible for his acts and its liability may not be limited through the Act. *Id.* at 411.

 Furthermore, Petitioner must be denied relief because it failed to properly train Morton on how to perform the agitation dredging. General Manager Haberli gave the following account of what agitation dredging training it had given Morton:

Q: When Roger Morton came to work here, did you explain to him what you wanted him to do in connection with, as you call it, washing out under the docks?

A: Yes.

Q: And did you give him some outline, some procedure that you wanted him to follow in doing that?

A: No. because I've only been her myself for—when Roger came I was here maybe three years, so I'm learning how this low country works myself.

(Haberli depo., p. 14.) Morton agreed with this evaluation of the instruction *vel non* given to him pertaining to the agitation dredging procedure to be utilized. (Morton depo., p. 9.) This testimony is dispositive in that failure to train a vessel's crew eradicates the protections afforded by the Act. *See Hercules Carriers,* 768 F.2d at 1568; *Complaint of Armatur, S.A.,* 710 F.Supp. 390, 398 (D.P.R.1988). Limitation here is properly denied for Petitioner's admitted failure to properly train Morton as to the proper procedure for agitation dredging.

 Finally, it is undisputed that this was not the first time that Morton or other employees of Petitioner had left a moored tug unmanned to perform the agitation dredging. Whether this occurred all the time or only sporadically, Petitioner must be charged with knowledge of this act because the undisputed facts tell the Court that any unmanned dredging occurred in broad daylight in an open boat basin. "Privity and knowledge is established where the means of obtaining knowledge exist, or where reasonable inspection would have led to the requisite knowledge. Thus, knowledge is not only what the shipowner knows but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss." *Hercules Carriers,* 768 F.2d at 1564 (citations omitted). In this case, it is not disputed that Petitioner could easily have discovered about the use of unmanned tugs. This fact, coupled with the fact that the Tugboat PALMER JOHNSON—a vessel which is essentially a floating power plant—is consistently moored and running in a boat basin filled with multimillion dollar yachts, leads to the only sensible conclusion: the reasonable shipowner will take the precaution to ensure that *somebody* is actually on the tug. In this case, Petitioner claims that it never took that precaution— either through inspection or proper training. This Court, however, will not allow that omission to excuse Petitioner from liability in this case.

Claimant's Motion for Partial Summary Judgment is granted.

### III. *Conclusion.*

The Eleventh Circuit and its predecessor circuit have repeatedly indicated that the Limitation of Liability Act is "hopelessly anachronistic" and that its purpose has been outlived. *Hercules Carriers,* 768 F.2d at 1564; *University of Texas Medical Branch at Galveston v. United States,* 557 F.2d 438, 441 (5th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978) Anachronistic though it may be, it remains on the books and must be enforced by this Court. In this case, however, the Act affords absolutely no relief to Petitioner. Petitioner is

not eligible for exoneration from or limitation of liability for the reasons stated above. Furthermore, because Petitioner has admitted the negligence of Morton, and because the limitation has been denied, the question of liability has been adjudicated through this decision.

With the questions of limitation and liability having been resolved, the only thing that remains to be decided is the amount of damages for which Petitioner is liable to Claimants; this Court possesses the jurisdiction to decide the matter of damages in this action despite this action having been filed as a Petition for Exoneration. *See Hartford Accident and Indemnity Co. v. Southern Pacific Co.*, 273 U.S. 207, 215–17, 47 S.Ct. 357, 71 L.Ed. 612 (1927); *see, e.g., Complaint of Chevron Transport Corp.*, 613 F.Supp. 1428 (M.D.Fla.1985). Therefore, the parties are **INSTRUCTED** to meet and confer and devise any stipulations regarding damages that may be reached between the parties; the parties will then send a letter to the Court no later than June 4, 1997, advising the Court as to: how much time the bench trial on damages will consume; what witnesses will be called at the trial; and what trial exhibits will be presented to the Court for its consideration. Soon after receiving that communication, this Court will schedule this matter for trial and final disposition.