In the Matter of the Complaint of G & G SHIPPING COMPANY, LTD. OF ANGUILLA, as Owner of the M/V "WISHING STAR" for Exoneration from or Limitation of Liability, Petitioner.

WILLIAM H. McGEE & CO., INC., Plaintiff,

v.

The M/V "NEDLLOYD VAN NOORT", et al., Defendants.

Alan GUMBS and Carlos Gumbs, Plaintiffs,

v.

The M/V "NEDLLOYD VAN NOORT", et al., Defendants.

INSTITUTE OF LONDON UNDERWRITERS, Plaintiff,

v.

The M/V "NEDLLOYD VAN NOORT", et al., Defendants.

Civ. Nos. 89–0701 HL, 89–1653 HL, 89–1669 HL and 89–1266 HL.

United States District Court, D. Puerto Rico.

April 26, 1991.

Fernando D. Castro, Calvesbert & Brown, San Juan, P.R.

Lourdes C. Menendez, Carolina, P.R.

Fernando Quintana, Sec., San Juan, P.R.

Carlos J. Quilichini, Hato Rey, P.R.

Rodriguez, Portas, Hidalgo, Inc., Aureliano J. Reyes, Controller, Puerto Nuevo, San Juan, P.R.

Eugene F. Hestress, Old San Juan, P.R.

## OPINION AND ORDER

LAFFITTE, District Judge.

[T]he principal failing occurred in the sailing,

And the Bellman, perplexed and distressed,

Said he *had* hoped, at least, when the wind blew due East,

That the ship would *not* travel due West![1]

---

1. Lewis Carroll, *The Hunting of the Snark*, Fit. 2, "The Bellman's Speech."

The helmsman of the doomed M/V Wishing Star (the "Wishing Star") certainly can share the sentiments of Lewis Carroll's Bellman, for had he turned right instead of left, the Wishing Star would not now be lying on the ocean floor. The Wishing Star collided with the M/V Nedlloyd Van Noort (the "Van Noort") on December 16, 1988, interrupting an otherwise clear and tranquil night shrouding the international waters off the northern coast of Puerto Rico. Fortunately, there was no loss of life. The collision spawned four separate actions.

The owner of the Wishing Star, G & G Shipping Co. ("G & G"), petitioned for limitation of liability pursuant to 46 U.S.C.App. § 181, *et seq.*, alleging the absence of privity and knowledge of any acts of negligence or unseaworthiness that led to the collision. The limitation action involves several cargo claimants with interests in the cargo that was lost aboard the Wishing Star. The Van Noort's owner, Nedlloyd Lijnen B.V. ("Nedlloyd"), has also joined as a claimant to recover damages sustained to the Van Noort. In a second action, the Institute of London Underwriters ("I.L.U."), the Wishing Star's hull underwriter, filed suit against the Van Noort to recover for the hull loss.[2] In a third action, William H. McGee and Co., an insurer of some of the cargo aboard the Wishing Star, filed a claim by subrogation against the Van Noort. Finally, two of the principal shareholders of G & G, Alan and Carlos Gumbs, filed an action against the Van Noort for the loss of property that was aboard the Wishing Star.[3] The Court, having original jurisdiction pursuant to 28 U.S.C. § 1333, consolidated the separate actions for a single trial, held on December 3–5, 1990.[4] Af-

ter due consideration and deliberation on the testimonial and documentary evidence submitted, the Court enters its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. The Wishing Star was a 156–foot, 188 gross ton cargo vessel engaged in the inter-island trade between Puerto Rico and the Lesser Antilles. It flew the Anguillan flag and was owned and operated by G & G, an Anguillan, British West Indies corporation with its principal office located at The Valley, Anguilla. The Wishing Star is equipped with radar, a VHF radio and manual steering.

2. G & G, comprised of three shareholders including Alan and Carlos Gumbs, purchased the Wishing Star in May, 1988. Carlos Gumbs (hereinafter, "Captain Gumbs") is the president of the corporation and holder of 51% of its shares. Alan Gumbs is the corporation's secretary and managing officer. Captain Gumbs, a seaman with over 20 years experience in the inter-island trade and a licensed Anguillan and Honduran captain, was also the Wishing Star's master, living much of the time aboard the vessel. Besides Captain Gumbs, there were five members of the Wishing Star's crew, only one of whom, the third engineer Lenox Phillips, was licensed. The remaining four unlicensed crew members took watches on the bridge, generally under the supervision of Captain Gumbs.

3. The Van Noort, a 600–foot, 20,000 gross ton container ship, flies the Dutch flag. It is owned by claimant-defendant Nedlloyd, a Netherlands corporation with its principal office in Rotterdam. The Van

---

**2.** I.L.U., suing by way of subrogation, represents a group of insurance companies proceeding collectively. In this action various parties who appeared as cargo claimants in the limitation proceeding have intervened as plaintiffs.

**3.** Alan Gumbs has filed a claim for the loss of personal cargo; Carlos Gumbs seeks to recover the loss of personal property.

**4.** That the collision occurred in international waters between two foreign flagships is no bar to this Court's jurisdiction. A collision on the high seas between vessels of different nationalities is a proper subject of inquiry in any court of

admiralty which first obtains jurisdiction. *"The Belgenland"*, 114 U.S. 355, 362–63, 5 S.Ct. 860, 863, 29 L.Ed. 152 (1885). The Court first obtained jurisdiction over the limitation action filed by petitioner G & G, on May 22, 1989, and subsequently exercised jurisdiction over the remaining claims. Notwithstanding Nedlloyd's initial allegations as to this Court's lack of jurisdiction, it nonetheless submitted voluntarily to the jurisdiction of the Court and presented its claim for the Van Noort's hull damages in the limitation action and put forth its defense in the remaining consolidated actions at trial.

Noort, is engaged in "round the world" trade, and is replete with modern navigational equipment, including two radars, an Automatic Plotting Radar Aid ("ARPA"), gyro repeaters, echo sounders, a course recorder, a gyro compass, a magnetic compass, an automatic pilot and a satellite navigator.

4. On the night of December 15, 1988, the Caribbean waters were calm, the visibility good and the maritime traffic relatively light. The Van Noort departed from St. Lucia, in the Netherlands Antilles, en route to San Juan, Puerto Rico, with a crew of twenty three, headed by Captain Adrian Van Loo. The estimated time of the crossing was 24 hours. At approximately 10:00 p.m. on that same night, the Wishing Star and her crew of six left San Juan harbor fully loaded with cargo bound first for St. Maarten, Netherlands Antilles. The Wishing Star's usual course would take her across the northern coast of Puerto Rico in an easterly direction through the virgin passage between the islands of St. Thomas and Culebra.

5. At midnight, as December 15 slipped quietly into December 16, Patrick Riley, an unlicensed seaman with four years experience as a helmsman, a lookout, a cargo loader and a cook, came up to the bridge to take the Wishing Star's wheel for the 12:00 a.m. to 4:00 a.m. watch. Riley, along with the rest of the crew, had been loading cargo onto the Wishing Star from 7:00 a.m. that morning until 7:00 in the evening. When the Wishing Star left San Juan at 10:00 p.m. Riley testified that he went below to "cool[ ] out for a while and catch myself." Two hours later he was awake and at the helm.

6. Before approaching the wheelhouse Riley confirmed that all navigation and running lights were operating. The Wishing Star's radar was operating, but Riley was not trained in radar. He testified that he glanced at the screen every half hour or so to make sure the Wishing Star was clear of land on her starboard side. Riley continued to steer the ship's course at 110 degrees with a speed of approximately 11–12 knots.

7. Captain Gumbs supervised Riley while on watch, and served as the lookout. He left the bridge from time to time, always returning to check Riley's piloting and navigation. The helmsman on the previous watch, Charles Bryson, occasionally came up to the bridge to smoke cigarettes and serve as lookout when Captain Gumbs was below. Riley stated that visibility from the bridge was good, except for the glare from the lights of St. Thomas off the bow of the Wishing Star. Riley remembers being able to site a cruise ship about eight miles away off to the port side around 1:00 a.m.

8. The Van Noort steadily made her way up from St. Lucia, and prepared to make a turn to the west across the northern coast of Puerto Rico toward San Juan when the Van Noort's third officer, 24 year old Gisbert S. Van Nieuwkoop, came on duty to take the 12:00 to 4:00 a.m. watch. This particular shift was Nieuwkoop's last watch in a six month tour aboard the Van Noort. Nieuwkoop, is a graduate of a Dutch maritime academy and on the night of the collision he had been sailing as a fully licensed officer for one and a half years. Nieuwkoop stood his midnight watch on the bridge with one lookout, an unlicensed twenty year old seaman named Jacob Kocklekoren.

9. Shortly after taking over as watch officer on the bridge, Nieuwkoop increased the engine's revolutions to 88 rpm's, with a resulting speed equivalent to "full ahead" or slightly less than full speed. Captain Van Loo had requested that the watch officers strive to reach San Juan by 4:00 a.m. in order to arrive ahead of the cruise ships and avoid delay. Nieuwkoop took radar bearings every half hour and plotted these on the Van Noort's marine chart. Shortly before 1:00 a.m. Nieuwkoop changed course from a northerly direction, to a westerly course across the northern coast of Puerto Rico. The Van Noort's course recorder reflects this with a change from 346 degrees to 290 degrees. The Van Noort's steering was on automatic pilot.

10. At approximately 1:30 a.m. Nieuwkoop spotted another vessel on the ship's

radar about 13 miles away. He subsequently confirmed this visually, sighting a white masthead light about a half a compass point or 5.5 degrees off the Van Noort's port bow. Soon Nieuwkoop was able to see the red port light of the approaching vessel—the Wishing Star.

11. Nieuwkoop watched the Wishing Star approach for about 20 minutes without noticing a significant change in her bearing. At 1:50 a.m., at a distance of about seven miles from the Wishing Star, Nieuwkoop realized that the vessels were on reciprocal or near reciprocal courses. He took evasive action by attempting to alter the Van Noort's course 10 degrees to his starboard. Nieuwkoop checked with the Van Noort's ARPA, and calculated the closest point of approach ("c.p.a.") with the Wishing Star at three cables, or 1,800 feet. Nieuwkoop considered this to be a safe distance. Nieuwkoop's intended change to starboard by 10 degrees actually resulted in only a 6 degree alteration, thereby reducing the c.p.a. with the Wishing Star to approximately 1000 feet.

12. At 1:53 a.m., as the vessels drew ever nearer, Nieuwkoop allowed his lookout Kocklekoren to leave the bridge. Nieuwkoop continued to see the Wishing Star's red port light grow more prominent while the green starboard light remained hidden. He concluded there was no danger of a head on situation and that the ships would make a safe port to port passing.

13. At approximately 1:53 a.m., Captain Gumbs left the bridge of the Wishing Star leaving Riley alone at the helm. Before leaving the bridge, Captain Gumbs testified that he checked the radar but failed to notice the Van Noort approaching fast off the Wishing Star's port bow. Without lookouts the vessels approached one another, one cognizant, the other oblivious and both unaware of the impending doom that lay ahead.

14. According to the Van Noort's marine chart, Nieuwkoop had a scheduled course change to port at 2:00 a.m. Captain Van Loo had plotted a change in course from 290 degrees to 275 degrees at a position 10 miles northeast of Cape San Juan.

At 2:00 a.m. Nieuwkoop went to his radar scopes to get a fix of his position off Cape San Juan, placing the Van Noort 9.6 miles off the Cape. He then went to place this fix on the marine chart located on the table on the opposite side of the wheelhouse. The taking of the radar fix took about one minute.

15. The radar Nieuwkoop used to check the Van Noort's position relative to Cape San Juan was set on a 24 mile range, a range which he himself admitted was inappropriate to observe the Wishing Star which was then only about 3,600 feet away. Nieuwkoop testified that he continued to observe the Wishing Star on another radar screen located nearby and set to a closer range.

16. At approximately 2:03 a.m., Riley testified that he saw something dark suddenly appear in front of the Wishing Star and loom over him. Reacting instinctively to what he perceived to be immediate danger, Riley attempted to take evasive action by turning hard to port.

17. Upon returning several steps to the wheelhouse, after taking the radar fix, Nieuwkoop saw the Wishing Star inexplicably veer to her left directly into the path of the Van Noort. Nieuwkoop blew one blast of the whistle and turned the Van Noort hard to starboard, without disengaging the automatic pilot.

18. Within a minute the ships collided; the starboard bow area of the Wishing Star hit the port bow of the Van Noort. The Van Noort crushed the Wishing Star's wheelhouse causing the vessel to list and burst into flames. All aboard the Wishing Star abandoned ship and were rescued by the crew of the Van Noort.

19. The United States Coast Guard arrived on the scene and allowed the Van Noort to continue on to San Juan. The Wishing Star soon capsized, and fearing environmental damage, the Coast Guard sank her.

20. Upon the Van Noort's arrival at San Juan the Coast Guard interviewed personnel from both vessels but closed its investigation because the incident involved two

foreign flag ships and had occurred in international waters.[5]

## II. CONCLUSIONS OF LAW

At trial, the parties presented extensive evidence including expert testimony concerning their vessels' respective courses and actions taken on the night of December 15–16. Nedlloyd, as owner of the Van Noort, contends that the sole proximate cause of the collision was the negligence and unseaworthiness of the Wishing Star, culminating in Riley's panic and sudden turn to port. Nedlloyd argues that this negligence is directly attributable to G & G, the owner of the Wishing Star. G & G suggests that Riley's action was taken *in extremis* and argues that the Van Noort proximately caused the collision through the negligence of her helmsman, Nieuwkoop. Alternatively, G & G requests that it be exonerated from liability, should the Court find fault with the Wishing Star. The Court begins its discussion with the issue of fault.[6]

### A. *The Pennsylvania Rule*

■ Collision liability is based on fault, a concept that presupposes a common standard of appropriate conduct. G. Gilmore & C. Black, *The Law Of Admiralty* § 7–3 (2d ed. 1975). The parties agree that the International Regulations For Preventing Collisions At Sea, 33 U.S.C. foll. § 1602 (the "72 Colregs"), are the rules of the road to be adhered to in the instant action. Fault will be predicated upon a finding that a vessel has violated one of these Rules. The fault accorded each party must have contributed to the collision, for a vessel may escape liability if it is plain that the violations played no role in the accident. *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873). To absolve itself from liability a vessel must overcome the burden provided by the Pennsylvania Rule. This judge-made rule, derived from *The Pennsylvania*, is the hoary anchor of American maritime jurisprudence. It dictates that when a ship

> is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*Id.* at 135–36.

Due to its exceedingly difficult burden, the Pennsylvania Rule has been a stubborn thorn in the sides of shipowners and attorneys alike.[7] Not surprisingly, plaintiffs claim that the Pennsylvania Rule is inapplicable to the present case. Instead, plaintiffs suggest that the burden of proof with respect to violations of the 72 Colregs ought to be governed by the International Convention For The Unification Of Certain Rules With Respect To Collision Between Vessels, Brussels 1910 (the "Convention").[8] Article 6 of the Convention abolishes legal presumptions of fault, leaving courts with discretion to attribute fault as they see fit rather than following the rigid rule of the *Pennsylvania*.

Although the United States is not a signatory to the Convention, the Court recognizes its power to take judicial notice of foreign law. *See* Fed.R.Civ.P. 44.1.

---

**5.** The United States Coast Guard report of the accident was admitted into evidence, pursuant to Fed.R.Ev. 803(8). The Court minimally considered the fact based portions of the report but arrived at its own finding of facts independently and by reference to all the evidence submitted. None of the report's conclusions were relied upon.

**6.** I.L.U., William H. McGee and Co., Alan and Carlos Gumbs and all other parties who intervened seeking recovery from Nedlloyd, the owner of the Van Noort, are collectively referred to herein as "plaintiffs" or the "Wishing Star".

**7.** G. Gilmore and C. Black regard the rule as a "drastic and unusual presumption." *The Law of Admiralty*, § 7–5 (2d ed. 1975).

**8.** For the complete text of the Convention, see 6 Benedict, Admiralty 3–7 (6th ed. 1941). The Netherlands and Anguilla are both signatories to the Convention.

Nevertheless, the Court finds no reason to depart from the Pennsylvania Rule in this case. The Court notes that plaintiffs have relied solely on the Ninth Circuit case of *Ishizaki Kisen Co., Ltd. v. United States,* 510 F.2d 875 (9th Cir.1975), in which that court ruled that an accident occurring in Japanese waters, between a Japanese vessel and an American vessel, should be governed by the Convention—to which Japan is a signatory—rather than the Pennsylvania Rule.

In discussing the Pennsylvania Rule, the Ninth Circuit concluded that neither of its purposes dictated its application to the facts before it. The primary purpose of the Pennsylvania Rule is to "enforce obedience to the mandate of the statute violated." *The Pennsylvania,* 86 U.S. at 135. The Ninth Circuit concluded that, while the Rule would indeed promote obedience to local Japanese Port Regulations Law, Japanese maritime law never included a rule similar to the Pennsylvania Rule and probably never would. *Ishizaki,* 510 F.2d at 880. The court seemed reluctant to use the Pennsylvania Rule in conjunction with Japanese law for fear of "frustrating the ends of the Japanese system by necessitating the resort to the arbitrary result that an equal division of damages provides." *Id.* This reasoning is wholly inapposite here since this action, occurring in international waters, involves no application of foreign law. This obviates the need for the Court to determine whether the Pennsylvania Rule is a part of the law of the place of collision. Moreover, the parties have agreed on the application of the 72 Colregs, and a rule encouraging obedience to these rules of the road is well within the interests of this forum.

A second purpose of the Pennsylvania Rule discussed by the Ninth Circuit is its simplification of the adjudication of collision cases "when applied in conjunction with a system of admiralty law, such as is presently followed by the courts of the United States, in which there is an equal division of property damages when both vessels are at fault." *Ishizaki,* 510 F.2d at 880. Since the parties in *Ishizaki* agreed that the Japanese comparative fault system would apply, this objective was nullified. Plaintiffs now employ this reasoning anachronistically, however, for the United States has abolished the much maligned divided damages rule, in favor of a rule apportioning damages according to the comparative degree of fault. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Despite this development, the Pennsylvania Rule has not languished; it remains a vital component of American maritime law. *See Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1160 (2d Cir.1978). Consequently, plaintiffs' reliance on the reasoning of *Ishizaki* with respect to the Pennsylvania Rule's second purpose is misplaced.

Plaintiffs, continuing to adhere to *Ishizaki,* also argue that the Pennsylvania Rule is substantive, rather than procedural, as it is outcome determinative. *See Ishizaki,* 510 F.2d at 880–81. Indeed, where the burden of proof is such that it affects the decision rather than regulates conduct, the law of the forum need not be applied. *See* Restatement (Second) of Conflict of Laws § 134 (1971). The Court notes, however, that application of the Pennsylvania Rule is not determinative of the outcome in this case. There is ample evidence to find negligence without the aid of the Rule. Moreover, the Restatement (Second) of Conflict of Laws discourages a wooden approach to the substance/procedure dichotomy, suggesting that courts instead focus on whether the interests of the forum will be served by the application of the rule. § 122 comment b.

■ Assessing the interest of the forum in *Ishizaki,* the Ninth Circuit found that it was outweighed by the *lex loci delecti,* Japan. But the Ninth Circuit noted that "[u]nder circumstances other than those presently before us it may be appropriate to apply the Rule because the interests of the forum may outweigh those of the place of the accident." *Ishizaki,* 510 F.2d at 881. Here, the forum's policy is implicated and is not subordinated to the policies of Anguilla, the domiciliary of the Wishing Star but not the situs of the accident. While the Court would be reluctant to impose our

rules on the standard of care for the operation of a vessel in Anguillan waters, the collision here occurred in international waters. And while the interests of the domicile must be weighed, a ship is by nature transient, making its domicile somewhat of a legal technicality. Where an accident occurs beyond a ship's home port, refuge in the law of domicile is not automatic but must be viewed in light of countervailing interests. In light of the foregoing, the Court finds that the facts of this case, unlike *Ishizaki,* do not warrant a departure from the Pennsylvania Rule. With the Rule's burden in mind, the Court turns to the specific violations alleged.

### B. Violations Of The Rules Of The Road

Plaintiffs claim that the Van Noort is guilty of failing to have a proper lookout, of failing to properly determine the risk of collision, of failing to take appropriate action in order to avoid a collision, of navigating at an unsafe speed, and of failing to properly signal its alteration of course to starboard. Nedlloyd alleges that the Wishing Star also failed to keep a proper lookout and failed to properly determine the risk of collision. In addition, Nedlloyd contends that the Wishing Star violated the rules of the road with respect to head-on situations.

### (1) NEGLIGENCE OF THE WISHING STAR

Rule 5 of the 72 Colregs requires that every vessel "at all times maintain a proper lookout by sight and hearing ... so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. foll. § 1602. The Supreme Court emphasized the importance of this basic rule of seamanship in *The Ariadne,* 80 U.S. (13 Wall.) 475, 478–79, 20 L.Ed. 542 (1861):

> The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend.... Every doubt as to the performance of the duty, and the effect of

non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary.

■ Captain Gumbs supervised the helmsman's steering and was supposed to serve as the Wishing Star's lookout. But Captain Gumbs left Riley, an unlicensed helmsman alone at the wheel from time to time in order to do paper work below and thus failed to maintain a constant and vigilant watch. Consequently, Captain Gumbs testified that he never visually sighted the Van Noort, although it was a clear night and the vessels were on near reciprocal courses. Although Riley had the intermittent company of Charles Bryson, the off-duty helmsman, there is no evidence that he actually substituted for Captain Gumbs. The absence of Captain Gumbs on the bridge was a direct violation of Rule 5. The Wishing Star's second mistake with respect to Rule 5 concerns Riley's competence. A proper lookout must be maintained by a competent person of suitable experience. *Chamberlain v. Ward,* 62 U.S. (21 How.) 548, 570, 16 L.Ed. 211 (1859). " 'An inefficient lookout is equivalent to none.' " *Complaint of Interstate Towing Co.,* 717 F.2d 752, 755 (2d Cir.1983) (citations omitted). Riley's failure to notice the huge Van Noort for over half an hour as it approached on a near reciprocal course until it was practically on top of him raises the presumption that he was inattentive at his post. *See Capt'n Mark v. Sea Fever Corp.,* 692 F.2d 163, 167 (1st Cir. 1982); *Mystic S.S. Corp. v. M/S Antonio Ferraz,* 498 F.2d 538, 541 (2d Cir.1974).

■ The Wishing Star's attempt at rebuttal consisted of expert testimony by Paul Simpson, a marine surveyor,[9] who said that Riley might have confused the lights from the Van Noort with the background glare of the lights from St. Thomas. While the Court finds the explanation plausible, it is a mistake more akin to a blunder as it evidences an obvious lack of experience and training. At the point of

---

**9.** Paul Simpson is a marine surveyor and a graduate of the Massachusetts Maritime Academy. He holds an unlimited master's license enabling him to pilot any size ocean going vessel.

collision, the Wishing Star was approximately 25 miles from St. Thomas. Besides the doubt cast as to the presence of any lights on St. Thomas with that type of range, a vigilant watch would have noticed the lights of the Van Noort moving and growing more prominent, and would have realized that land was far off.[10] Riley, an unlicensed helmsman, was an inefficient lookout, and with Captain Gumbs down below, the Wishing Star was in clear violation of Rule 5 of the 72 Colregs. This violation was clearly a contributing cause of the collision.

■ Captain Gumbs and helmsman Riley were also negligent in failing to properly use the Wishing Star's radar, thereby increasing the chances of a collision. Rule 7 of the 72 Colregs, 33 U.S.C. § 1602, governs a determination of whether a risk of collision exists. It provides, in relevant part:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

The Wishing Star's radar was in good operating condition and capable of locating the approaching Van Noort. Before leaving the bridge, Captain Gumbs testified that he checked visually and by radar but failed to see the Van Noort, then 7 miles away. This error in failing to properly use the radar scope, especially before leaving the watch in the hands of a helmsman ignorant

in the usage of radar, is a clear violation of Rule 7(b). The Court is convinced that had Captain Gumbs used the Wishing Star's radar effectively, he would have been able to avoid the collision.

■ The Wishing Star's sudden turn to port directly into the path of the oncoming Van Noort was undoubtedly the cause in fact of the collision. It was also a proximate or legal cause. Rule 14(a) of the 72 Colregs states that when a risk of collision exists due to vessels approaching on reciprocal or near reciprocal courses, "each shall alter her course to starboard so that each shall pass on the port side of the other." This elemental rule is known to all seamen, seasoned and amateurs alike. Riley's failure to observe it, due to fear and panic, is unfortunate but inexcusable. Evidence conclusively shows that had Riley simply maintained his course, the collision would have been averted.[11] This direct violation of Rule 14 requires the Court to weigh it heavily in apportioning the respective degrees of fault.

■ Plaintiffs argue that Riley's turn to port seconds before the collision was taken in apprehension of imminent danger—the avoidance of a possible grounding—and therefore must be viewed as an action taken *in extremis*. Plaintiffs thus admit that Riley's turn to port was technically incorrect but argue that it was justified under the circumstances. The Court is not persuaded.

The *in extremis* doctrine provides a limited exception to the general rule of strict compliance with the rules of the road. The Supreme Court, in *The Blue Jacket*, 144 U.S. 371, 392, 12 S.Ct. 711, 719, 36 L.Ed. 469 (1892), stated that "where one ship has, by wrong manoeuvres, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has

---

**10.** This is not a case where the failure to notice an approaching vessel is mitigated by that vessel's absence of running lights. *See Capt'n Mark v. Sea Fever Corp.*, 692 F.2d at 167.

**11.** A curious development at trial, perhaps of only anecdotal value here, was Nedlloyd's line of questioning about Riley's automobile driving habits. In St. Kitts, Riley's home, the public

drives on the left side of the road. Apparently, Nedlloyd wanted to draw the inference that Riley instinctively turned to port, for when facing a head on situation on the road, one generally turns to the side rather than into oncoming traffic. For Riley, this would be to the left—or to port.

done something wrong...." The First Circuit recently invoked the doctrine and explained that the vessel seeking shelter under it must be " 'free from fault until the emergency arose.' " *Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F.2d 1, 6 (1st Cir.1990) (quoting *Bucolo, Inc. v. S/V Jaguar*, 428 F.2d 394, 396 (1st Cir.1970)); *see also* G. Gilmore & C. Black, *supra* § 7–3 ("When a vessel, *through no fault of her own*, is placed in a position where a collision is seemingly imminent, she will not be cast in fault for action taken in violation of the Rules.") (emphasis added). As the Wishing Star significantly contributed to the dangerous situation leading to the collision, violating several of the 72 Colregs, she cannot now avail herself of the *in extremis* doctrine. The conclusion that the Wishing Star proximately caused the collision [12] does not lift the Van Noort off the hook entirely. It remains for the Court to determine whether the Van Noort in any way contributed to the collision.

## (2) NEGLIGENCE OF THE VAN NOORT

Plaintiffs charge that the Van Noort's helmsman, Nieuwkoop, also failed to abide by the lookout provisions of Rule 5 by allowing his lookout Kocklekoren to leave the bridge at a critical moment when Nieuwkoop must have realized that a close-quarters situation was about to develop. The Court agrees. Nedlloyd attempts to justify the Van Noort's temporary absence of a lookout by noting that Nieuwkoop had spotted the Wishing Star some 13 miles away and subsequently tracked the vessel for over half an hour until it unexpectedly turned to port. Nedlloyd argues that under these circumstances an extra man on the bridge would have served little purpose save providing Nieuwkoop with another pair of eyes.

Had Nieuwkoop been on constant and vigilant watch, Nedlloyd might be correct.[13] Failure to comply with Rule 5 may be excused where a lookout would have been a superfluous addition to the navigational crew. *See The Maria Martin*, 79 U.S. (12 Wall.) 31, 42, 20 L.Ed. 251 (1870); *U.S. v. Soya Atlantic*, 330 F.2d 732 (4th Cir.1964); *Slobodna Plovidba v. King*, 688 F.Supp. 1226 (W.D.Mich.1988). However, where, as here, a helmsman is busy attending to other tasks, he is not a proper lookout. *Interstate Towing*, 717 F.2d at 755; *see also Complaint of Flota Mercante Grancolombiana, S.A.*, 440 F.Supp. 704 (D.C.N.Y. 1977) (lookouts must have no other duties to perform). According to the marine chart presented at trial, when the ships were at a distance of approximately 3,600 feet from one another and approaching at a combined speed of 300 feet every 10 seconds,[14] Nieuwkoop was involved with the taking of a radar fix off of Cape San Juan, which he then placed on the marine chart located on the table at the opposite side of the wheelhouse.

To argue that the preoccupation was merely a momentary distraction blurs the mandate of the lookout provision. The man at the wheel is not a proper lookout, for he has the task of navigating as his primary concern. *See Tug Ocean Prince*, 584 F.2d at 1159; *The Metamora*, 144 F. 936 (1st Cir.1906) *see also The Corozal*, 62 F.Supp. 123 (D.C.N.Y.1945). This is especially true where the navigator is entering a close-quarters situation. It is at this crucial moment that an extra pair of eyes might spot the sudden and the unexpected and perhaps shave a few valuable seconds off of the vessel's response time. The Court is mindful of not becoming a Monday

---

12. Without entering the definitional bog of "proximate cause", the Court simply notes that the term refers to the failure to protect another where a duty to protect exists. Thus there can be more than one proximate cause of an accident. *See e.g. Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F.2d 1, 5–6 (1st Cir.1990) (liability apportioned between pilot and vessel as both proximately caused the allision).

13. Nedlloyd, in its proposed findings of fact, suggests that the "adequacy of a lookout must be evaluated realistically in light of all the circumstances." *Capt'n Mark v. Sea Fever Corp.*, 692 F.2d 163, 166–67 (1st Cir.1982). This maxim is generally reserved for situations involving smaller boats with a limited crew.

14. At this speed, the vessels were scarcely two minutes apart.

morning admiral. Nevertheless, knowing that a close-quarters situation was developing in the dark of night, Nieuwkoop should not have allowed his lookout to leave the bridge. This was a clear violation of Rule 5 of the 72 Colregs and Nedlloyd has failed to overcome its burden of showing that the absence of a lookout did not contribute to the collision.

■ Nieuwkoop also failed to use the Van Noort's sophisticated radar and ARPA to plot the relative course and speed of the Wishing Star, in violation of Rule 7(b). *See Hellenic Lines, Ltd. v. Prudential Lines, Inc.,* 730 F.2d 159, 163 (4th Cir.1984). Nieuwkoop also failed to adhere to the strictures of Rule 7(d). That section provides:

> (d) In determining if risk of collision exists the following considerations shall be among those taken into account:
> (i) Such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change;
> (ii) Such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

Nieuwkoop admitted that the Wishing Star's bearings were relatively constant—a clear sign of risk under Rule 7(d)(i). Even if the Court credits the testimony of Nedlloyd's expert, John Deck,[15] to the effect that the bearing of the Wishing Star was changing relative to the Van Noort, the vessels here were approaching at close range, invoking Rule 7(d)(ii). Indeed, Deck testified that using the ARPA was "elemental" in determining the risk of collision. " 'A vessel equipped with radar is under a duty to use it intelligently and fully, and the master or pilot who fails to do so is heavily burdened to prove that such fault did not contribute to the collision.' " *Complaint of Potomac Transport Inc.,* 741 F.Supp. 395, 406 (S.D.N.Y.1989), *aff'd in part, vacated in part,* 909 F.2d 42 (2d Cir.1990) (citations omitted).

■ Nieuwkoop testified that he continuously observed the Wishing Star, and utilized the Van Noort's ARPA to determine the c.p.a., but this is no substitute for careful mechanical plotting of the Wishing Star's position. "Even continuous observation by a competent person is unlikely to be accepted as proper use of radar to obtain early warning of risk of collision." A. Cockroft & J. Lameijer, *A Guide to the Collision Avoidance Rules,* at 56 (2d ed. 1976).[16] Any calculations not intended to ascertain the course, speed and relative motion of an approaching vessel is not the "equivalent"—within the meaning of Rule 7(b)—of a system that does. *Hellenic Lines,* 730 F.2d at 163. Nieuwkoop also admitted that he did not activate the ARPA's anti-collision devices which included audio and visual alarms that might have provided early warning of risk of collision. The Court is not convinced that the failure to fully and properly use the sophisticated radar on board the Van Noort had no bearing whatsoever on the collision.

■ Plaintiffs also claim that the Van Noort did not take appropriate action in order to avoid the collision. Rule 8 of the 72 Colregs requires that a vessel respond to the risk of collision, where circumstances permit, "in ample time and with due regard to the observance of good seamanship." Rule 8(a), 33 U.S.C. foll. § 1602. The rule further states that an alteration of course "be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course ... should be avoided." Rule 8(b). An alteration of course is perhaps the most effective antidote to a close-quarters situation "provided that it is made in good time, is substantial and does not result in another close-quarters situation. Rule 8(c). Whatever a vessel's response, Rule 8 warns that action taken to avoid a collision must "result in passing at a safe distance." Rule 8(d).

**15.** John Deck is a marine consultant and a naval architect with a degree in naval engineering and a master's degree in mechanical engineering, both from the Massachusetts Institute of Technology.

**16.** The authors assisted in the drafting of the 72 Colregs. *See Hellenic Lines,* 730 F.2d at 163.

Rule 8 also provides that, "[i]f necessary to avoid a collision ... a vessel shall slacken her speed...." Rule 8(e).

The Court agrees with plaintiffs' allegation that the Van Noort violated every provision of Rule 8. After observing the Wishing Star off the Van Noort's port bow for over twenty minutes, and concluding that she was keeping a steady course and that evasive action was necessary in order to avoid a close-quarters situation, Nieuwkoop opened up a birth of what he thought to be 10 degrees to starboard. Satisfied that his c.p.a. would be 0.3 miles or 1800 feet, Nieuwkoop believed the situation to be under control. Had Nieuwkoop accurately maneuvered the Van Noort 10 degrees, his actions might still be regarded as imprudent. Due to navigational error, however, Nieuwkoop actually steered the Van Noort only 6 degrees starboard, amounting to a c.p.a. of approximately 1000 feet.

What constitutes a close-quarters situation is not defined in the 72 Colregs and must be determined on a case by case basis depending on the location of the vessels and the maneuverability space. The slim passage envisioned by Nieuwkoop, less than twice the length of the Van Noort, attempted at night without any indication that the approaching Wishing Star had sighted the Van Noort, is particularly brazen. In light of Captain Van Loo's standing orders considering one mile to be safe passage, and the sufficient sea room to the Van Noort's starboard side, a c.p.a. of 1000 feet is not substantial within the meaning of Rule 8(b) and 8(c).

Moreover, at no time during the intended passage did Nieuwkoop slacken the Van Noort's speed, a violation of Rule 8(e).[17] It appears that Nieuwkoop was preoccupied with the upcoming 2:00 a.m. course change of 15 degrees to port, and that the Van Noort's scheduled course change was hampered by the Wishing Star which continued approaching the Van Noort steady off her

port bow. Perhaps not wanting to veer too far off course to starboard, Nieuwkoop may have been overly frugal in his calculations. Whatever the cause, Nieuwkoop should have focused solely on the Van Noort's approach until the Wishing Star was safely past and clear. Not doing so was a clear violation of Rule 8(d).

■ Although Nieuwkoop unwittingly created a close-quarters situation rather than avoiding one, Nedlloyd argues that there was nothing imprudent about Nieuwkoop's actions because the Van Noort was obligated to proceed on the basis that the Wishing Star would maintain her course. *See The Victory*, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519 (1897). While the Van Noort was under no obligation to forecast the Wishing Star's sudden turn to port, this by no means excuses her from following the dictates of the rules of the road with respect to safe passage. Were vessels equipped with prescient radar devices, a helmsman could indeed calculate his maneuver to avoid a collision by a hair. But it is precisely because vessels cannot be counted on to expect the unexpected that the 72 Colregs mandate adherence to defensive strictures pertaining to early warning and substantial alteration of course to avoid collision. The Van Noort's errors are thus directly contrary to the dictates of Rule 8 and Nedlloyd has not been able to sustain its burden of showing that these errors could not have contributed to the collision.

■ When vessels are in sight of one another, and when the rules of the road require one of them to alter her course, Rule 34(a) of the 72 Colregs, 33 U.S.C. § 1602, states that "one short blast" shall indicate an alteration to starboard. Although the Van Noort emitted one blast when she turned hard to starboard immediately prior to the collision, plaintiffs seize on her failure to signal her starboard alteration about fifteen minutes earlier as a violation of Rule 34(a). It is doubtful, and

---

**17.** Nieuwkoop, upon taking over as watch officer of the Van Noort, increased the engine's revolutions to 88 revolutions per minute or 16.5 knots. Full speed ahead is generally recognized to be over 100 revolutions per minute or 18 knots. The Van Noort was thus going "full ahead" or slightly shy of "full speed."

plaintiffs have failed to show otherwise, that the rules require a signal to be given at 7 miles. Under Annex III, 33 U.S.C. foll. § 1602, the Rules discuss the audibility and range of whistles depending on the length of the vessel. For a vessel the size of the Van Noort—the largest category— the range is only expected to be 2 nautical miles. Thus, the failure to signal could not have been a factor in the collision.

■ The Van Noort, however, should have attempted to contact the Wishing Star on VHF radio. Especially in light of the intended close port to port passage, communication with the Wishing Star might have alerted the Wishing Star of the Van Noort's position in time to take evasive action. This error invokes Rule 2 of the 72 Colregs, 33 U.S.C. § 1602, which requires a vessel to take "any precaution which may be required by the ordinary practice of good seamen, or by the special circumstances of the case." It is certainly prudent seamanship to attempt radio contact with an approaching vessel on a reciprocal course, especially where there is no indication that the approaching vessel is aware of the circumstances.[18] Nieuwkoop should have done everything possible to warn the Wishing Star of the Van Noort's intentions, including communication by VHF radio. Nedlloyd has failed to demonstrate that the Van Noort's failure to communicate with the Wishing Star by VHF radio in no way contributed to the collision.

## C. Limitation Of Liability

■ G & G, as corporate owner of the Wishing Star, has petitioned the Court for limitation of liability pursuant to The Limitation of Vessel Owner's Liability Act (the "Act"), 46 U.S.C. § 181 *et seq.* Section 183(a) of the Act allows a vessel owner to limit its liability "for any loss, damage or injury by collision ... incurred without the

privity or knowledge of such owner" to the value of the vessel, which in this case is zero. In a limitation proceeding the initial burden is on the claimants to show that petitioner's vessel was unseaworthy[19] or negligent and that this unseaworthiness or negligence led to the collision. *Complaint of Armatur,* 710 F.Supp. 390, 397 (D.P.R. 1988). The burden then shifts to the owner to prove the absence of privity or knowledge of the acts of negligence or unseaworthiness. *Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943). The Court need not tarry long on the threshold question of causation. The foregoing discussion on fault has established that the negligence on board the Wishing Star was a proximate cause of the collision. The Court turns to the issue of privity.

■ Privity and knowledge are imputed to the owner if the owner " 'knew or should have known that a certain [unseaworthy] condition existed.' " *Potomac Transport,* 741 F.Supp. at 407 (quoting *Hellenic Lines,* 730 F.2d at 166). When the vessel is owned by a corporation, the privity and knowledge of an officer, managing agent, or supervisory employee suffices. *Id.* The owner of a vessel has a duty to provide her with a competent, well-trained crew, *Armatur,* 710 F.Supp. at 398, and privity will exist if the owner fails to train the crew or fails to make appropriate inquiries as to the crew's competence. *In re Ocean Foods Boat Co.,* 692 F.Supp. 1253, 1259 (D.Or.1988). Where, however, the negligence results from instantaneous navigational errors, such errors are generally not attributable to the owner, for the owner is not required to make the ship "failsafe." *Armatur,* 710 F.Supp. at 398. In this case the Court finds that G & G has not overcome its burden of proving a lack of privity and knowledge.

---

18. Unlike the scenario that developed in *Manhattan Prince, supra,* 897 F.2d at 5, where a virtual Tower of Babel created "a prescription for an accident," no language barrier existed here; both helmsman were fluent in English.

19. Seaworthiness is a variable concept that depends on the type of vessel and the nature of the

voyage. *Tug Ocean Prince,* 584 F.2d at 1155. It is commonly understood, however, that the vessel must be well equipped, properly manned by a competent captain and crew and fit for her voyage. *The Niagara v. Cordes,* 62 U.S. (21 How.) 7, 16 L.Ed. 41 (1859); *The Armatur,* 710 F.Supp. at 398.

█ Captain Gumbs is both the president of G & G and, with 51% interest, its principal shareholder. Although he left much of the financial handling of the corporation to his on shore partner Alan Gumbs, Captain Gumbs had the requisite authority and power to bind the corporation and is thus an owner under the meaning of the Act. *See Petition of Kinsman Transit Co.*, 338 F.2d 708 (2d Cir.1964), *cert. denied*, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965). Captain Gumbs, the Wishing Star's owner, was also Captain Gumbs the Wishing Star's master. Limitation of liability is meant to accord protection to " 'the physically remote owner who, after the ship breaks ground, has no effective control over his waterborne servants.' " *Armatur*, 710 F.Supp. at 398 (quoting *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir.1977)). And, as this Court stated recently, "the duty to control increases proportionally with the possibility of control." *Armatur*, 710 F.Supp. at 399.

In this case Captain Gumbs was hardly physically remote; he lived on board the Wishing Star. He also hired and supervised the Wishing Star's crew, thereby exerting control over them. Yet Captain Gumbs never asked Riley whether he was licensed or whether he knew how to use the Wishing Star's radar. Instead, he allowed Riley, an unlicensed helmsman with no working knowledge of equipment as vital as radar or a gyro compass, to take the wheel without constant supervision. The Court also questions the prudence of allowing Riley to take the helm for the 12:00 a.m.—4:00 a.m. watch—a shift known as the "dog-watch"—on only two hours sleep. Consequently, the Court finds that Riley's sudden turn to port was not the result of an instantaneous navigational error; rather it was a consequence of incompetence immanent in the Wishing Star before she ever left port. This unseaworthiness is directly attributable to Captain Gumbs.

The import of Captain Gumbs privity with Riley's negligence is lessened by the fact that Captain Gumbs himself was largely responsible for creating the conditions that contributed to the collision. He failed to keep a constant and vigilant lookout and he failed to properly use his radar which would have detected the approaching Van Noort. And, although Captain Gumbs holds a Master's License from Anguilla and Honduras, he admitted that he had no formal training in navigation. Alas, it is poignant that the Wishing Star's own expert witness, Paul Simpson, stated that he would hire neither Captain Gumbs nor Patrick Riley to man his vessel. Accordingly, the petition for limitation of liability is denied.

## CONCLUSION

█ The primary responsibility for the collision rests with the Wishing Star, but the Van Noort was not entirely faultless. The Court thus apportions 80% of the negligence to the Wishing Star and 20% of the negligence to the Van Noort. Having denied G & G's petition for liability, the cargo claimants are entitled to recover the following:[20] Lausell Aluminum Jalousies, Inc. (by its insurer General Accident Insurance Company of Puerto Rico), $21,018.69—$16,814.95 from G & G and $4,203.74 from Nedlloyd; William H. McGee and Co., Inc., $5,104.00—$4,083.20 from G & G and $1,020.80 from Nedlloyd; A. Suarez & Co., Inc., $37,138.60—$29,710.88 from G & G and $7,427.72 from Nedlloyd; and Victor M. Rincon, $26,570.00—$21,256.00 from G & G and $5,314.00 from Nedlloyd. Nedlloyd, also a claimant in the limitation action, may recover for damages to the Van Noort's hull in the amount of $27,600.00 from G & G.[21] Furthermore, in Civil No. 89–1669, Alan Gumbs and Captain Carlos Gumbs shall recover a total of $2,000 from Nedlloyd[22] for the loss of personal proper-

**20.** The parties stipulated, prior to trial, to the total monetary damages suffered by the cargo claimants.

**21.** This amount is 80% of the total damage to the Van Noort's hull (including loss of the vessel during repairs) or $34,500.00.

**22.** Although Alan Gumbs and Captain Carlos Gumbs alleged a loss of $100,000.00 for personal effects on board the Wishing Star, the Court finds, based on the scant evidence presented, that the total loss to the Gumbs is $10,000.00—20% of which is to be paid by Nedlloyd.

ty, and in Civil No. 89–1266, I.L.U. shall recover $79,645.37 from Nedlloyd for the loss of the Wishing Star.[23]  Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

**23.**  This figure is 20% of $398,226.84—the total amount paid by the insurance company for the loss of the Wishing Star's hull.